UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION
_____

MICHAEL J. DeGUELLE
2725 Bunting Court
Racine, WI 53402

   Plaintiff,

  vs.         Case No:

KRISTIN J. CAMILLI
1502 Howe Street
Racine, WI 53403-2377

MARK H. ECKHARDT
5792 Finch Lane
Greendale, WI 53129

GAYLE P. KOSTERMAN
4929 Lighthouse Drive
Racine, WI 53402-2664

DONALD L. PAPPENFUSS
4723 Weatherwood Lane
Racine, WI 53403-4445

ROBERT S. RANDLEMAN
143 West Parkfield Court
Racine, WI 53403

DANIEL J. WENZEL
3625 South Lane
Franksville, WI 53126-9423

  and

S.C. JOHNSON & SON, INC.
1502 Howe Street
Racine, WI 53403-2377

   Defendants.
_____

COMPLAINT
_____

COMES NOW the Plaintiff, Michael J. DeGuelle, by and through his attorneys, HEINS LAW OFFICE LLC, by Attorneys Janet L. Heins and James A. Walcheske, as and for a claim against the Defendants, alleges and shows to the court as follows:

## JURISDICTION AND VENUE

1.      The jurisdiction of this Court is conferred and invoked pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1961 *et seq.*, (specifically 18 U.S.C. § 1964(c)), and 28 U.S.C. § 1331.

2.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's Wisconsin law claims for breach of contract, wrongful termination and defamation.

3.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) because Plaintiff and all of the Defendants either reside in this district or have its principal place of business in this district, and all events giving rise to Plaintiff's claim occurred within this district.

## THE PARTIES

4.      The Plaintiff, Michael J. DeGuelle (hereinafter "DeGuelle"), is an adult resident of the State of Wisconsin residing in Racine County with a post office address of 2725 Bunting Court, Racine, Wisconsin  53402.  At all times relevant to this action until his termination on April 10, 2009, Plaintiff was employed in the Tax Department of S.C. Johnson & Son, Inc.

5.      The Defendant, Kristin J. Camilli (hereinafter "Camilli"), is an adult resident of the State of Wisconsin residing in Racine County with a post office address of 1502 Howe Street, Racine, Wisconsin 53403-2377.  At all times relevant to this action, Defendant Camilli was, and is, employed as Director of Human Resources for SCJ.  On information and belief, Camilli violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the named, individual Defendants'

2

(hereinafter "RICO Defendants") scheme to fraudulently conceal and benefit from federal tax credits erroneously provided by the Internal Revenue Service (hereinafter "IRS") to SCJ, by defrauding the IRS and United States taxpayers through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

6.      The Defendant, Mark H. Eckhardt ("hereinafter "Eckhardt"), is an adult resident of the State of Wisconsin residing in Milwaukee County with a post office address of 5792 Finch Lane, Greendale, Wisconsin 53129.  From January 1, 2009 to the present, Defendant Eckhardt was, and is, employed as Vice President and Chief Information Officer for SCJ.  On information and belief, Eckhardt violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the RICO Defendants' scheme to fraudulently conceal and benefit from federal tax credits erroneously provided by the Internal Revenue Service (hereinafter "IRS") to SCJ, by defrauding the IRS and United States taxpayers through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

7.      The Defendant, Gayle P. Kosterman ("hereinafter "Kosterman"), is an adult resident of the State of Wisconsin residing in Racine County with a post office address of 4929 Lighthouse Drive, Racine, Wisconsin 53402-2664.  At all times relevant to this action, Defendant Kosterman was, and is, employed as Executive Vice President – Worldwide Human Resources for SCJ.  On information and belief, Kosterman violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the RICO Defendants' scheme to fraudulently conceal and benefit from federal tax credits erroneously provided by the Internal Revenue Service (hereinafter "IRS") to SCJ, by defrauding the IRS and United States taxpayers through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

3

8.     The Defendant, Donald L. Pappenfuss (hereinafter "Pappenfuss"), is an adult resident of the State of Wisconsin residing in Racine County with a post office address of 4723 Weatherwood Lane, Racine, Wisconsin 53403-4445.  At all times relevant to this action, Defendant Pappenfuss was employed as a supervisor in SCJ's Tax Department.  On information and belief, Pappenfuss violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the RICO Defendants' scheme to fraudulently conceal and benefit from federal tax credits erroneously provided by the Internal Revenue Service (hereinafter "IRS") to SCJ, by defrauding the IRS and United States taxpayers through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

9.     The Defendant, Robert S. Randleman (hereinafter "Randleman"), is an adult resident of the State of Wisconsin residing in Racine County with a post office address of 143 West Parkfield Court, Racine, Wisconsin 53402.   At all times relevant to this action, Defendant Randleman was, and is, employed as Vice President, Corporate Tax Counsel for SCJ.   On information and belief, Randleman violated 18 U.S.C. §§ 1962(c) and (d) by actively participating in the RICO Defendants' scheme to fraudulently conceal and benefit from federal tax credits erroneously provided by the Internal Revenue Service (hereinafter "IRS") to SCJ, by defrauding the IRS and United States taxpayers through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

10.     The Defendant, Daniel J. Wenzel (hereinafter "Wenzel"), is an adult resident of the State of Wisconsin residing in Racine County with a post office address of 3625 South Lane, Franksville, Wisconsin 53126-9423.  At all times relevant to this action, Defendant Wenzel was, and is, employed as Global Tax Counsel for SCJ.   On information and belief, Wenzel violated 18

4

U.S.C. §§ 1962(c) and (d) by actively participating in the RICO Defendants' scheme to fraudulently conceal and benefit from federal tax credits erroneously provided by the Internal Revenue Service (hereinafter "IRS") to SCJ, by defrauding the IRS and United States taxpayers through that concealment, and by attempting to silence Plaintiff from exposing the errors and fraudulent concealment.

11. The Defendant, S.C. Johnson & Son, Inc. (hereinafter "SCJ"), was, at all times material herein, a privately-held domestic corporation doing business in the State of Wisconsin and engaged in interstate commerce with its principal place of business located at 1525 Howe Street, Racine, Wisconsin 53403-2237. For the purposes of Plaintiff's claims under 18 U.S.C. § 1964(c) (Counts One and Two), SCJ is not a defendant, but rather the enterprise through which the RICO Defendants conducted their racketeering activity. For the purposes of Plaintiff's claims for breach of contract (Count Three), wrongful termination (Count Four) and defamation (Count Five), SCJ is the sole defendant.

## GENERAL ALLEGATIONS

12. Plaintiff was employed by SCJ from approximately January 2, 1997 to April 10, 2009. From January 2, 1997, through approximately September 2004, Plaintiff was employed as International Tax Compliance Manager, and from approximately September 2004 through April 10, 2009, Plaintiff was employed as State Tax Manager.

13. As an employee of SCJ's Tax Department, Plaintiff had access and was exposed to SCJ's confidential financial information, including, but not limited to, tax information.

14. SCJ is comprised of approximately 12,000 employees and markets and sells household consumer products in more than 110 countries.

5

15.     For financial reporting purposes, SCJ's fiscal year ends ("FYE") on the last Friday in June of each year. For tax purposes, this is referred to as a 52 to 53 week year-end.

16.     In FYE 2008, SCJ generated approximately eight billion dollars in revenue, derived from interstate and international sales of its products.

17.     All income derived from interstate and international commerce is to be reported on IRS Form 1120, a corporate income tax return form. SCJ collects gross income from foreign sources including dividends, royalties, interest and sales income.

18.     The foreign source income contained within IRS Form 1120 is derived from IRS Form 1118, Form 5471 (reports income and expense of a foreign corporation), Form 8865 (reports income and expense of a foreign partnership) and Form 8858 (reports income and expense of a foreign branch operation).

19.     IRS Form 1118 is used to calculate the foreign tax credits that can be claimed on IRS Form 1120 and its purpose is to report all gross foreign income and expenses incurred and attributed to that income. From this, one can then determine the net foreign income in order to calculate the foreign tax credit allowed to be claimed.

20.     There are two types of foreign taxes that are allowed to be claimed as foreign tax credits against income, Section 901 credits and Section 902 credits.

21.     Section 901 credits are derived from foreign taxes paid and consist of withholding taxes on dividends, interest and royalties. Section 901 credits may also include any tax that a partnership or branch may have paid to a foreign government.

22.     Section 902 credits are also called "deemed paid" credits. Deemed paid credits are foreign taxes paid on the dividend income that the company collects. The foreign subsidiary pays

6

income taxes on those earnings and is "deemed paid" directly by the parent company itself.

23.     A Section 902 credit is accompanied by a Section 78 "gross-up." The Section 78 gross-up is required to add in the foreign taxes that were deducted to arrive at the net dividend. Without the Section 78 gross-up, or if a mistake is made with respect to same, a parent company would be claiming both a tax credit and a tax deduction on foreign taxes deemed paid, which is impermissible.

24.     Foreign tax credits cannot be used to offset income earned within the United States. Accordingly, there is a foreign tax credit limitation, which is a company's net foreign income multiplied by 35%. The limitation dictates the most foreign tax credits that can be claimed.

25.     In any given year, a company can have excess foreign tax credits or excess limitation. If excess credits exist, the company paid more in foreign taxes than the credit limitation allowed. If excess limitation exists, then the company may claim more credits than foreign taxes actually paid.

26.     When a company has excess foreign tax credits in any given year, the excess credits can be carried forward or backward to another tax year in which excess limitation is available. When excess credits are carried-back, a tax refund of United States income paid in that year becomes available.

27.     While Plaintiff held the position of International Tax Compliance Manager for SCJ from 1997 through 2004, he was responsible for preparing IRS Forms 1118, 5471, 8865 and 8858.

28.     In the position of State Tax Manager, Plaintiff was not directly involved in international tax reporting; however, he did assist in making calculations for SCJ's federal tax return. Most importantly to this action, Plaintiff, as State Tax Manager, was necessarily aware of

when and if SCJ filed an amended federal tax return.

29.     On or about December 6, 2000, Defendant Wenzel received IRS audit reports, also known as Revenue Agents Reports (hereinafter, "RAR"), for SCJ's FYE 1998, 1999 and 2000, that contained incorrect information regarding SCJ's Section 902 credits.

30.     An RAR is issued for each income or expense adjustment item.

31.     On or about December 15, 2000, Defendant Wenzel provided the erroneous RARs to Plaintiff for review.  In reviewing the audits, Plaintiff discovered a number of errors that resulted in a significant overstatement of tax credits for SCJ's FYE 1998, 1999 and 2000, resulting in an award of approximately $5,082,048 in foreign tax credits that SCJ should not have otherwise received.  The IRS made errors in each report involving four of SCJ's foreign subsidiaries: one Spanish, two Dutch, and one Canadian.

32.     With respect to the Spanish subsidiary, the IRS failed to account for a professional spin-off accurately, resulting in an erroneous $183,583 tax benefit to SCJ.

33.     With respect to the two Dutch subsidiaries, the IRS failed to accurately convert Dutch guilders back to United States dollars.  As a result, the tax credits were overstated, producing erroneous tax benefits to SCJ of $1,771,963 and $1,232,127, respectively.

34.     With respect to the Canadian subsidiary, the IRS erred in carrying forward the pool of foreign taxes available for credit from FYE 1996 to FYE 1997, which resulted in an erroneous tax benefit of $1,894,375 to SCJ.

35.     In approximately January 2001, Plaintiff approached Defendant Wenzel regarding the errors in the RARs and asked Wenzel how he wanted to remedy the errors and what he planned to tell the IRS.  Wenzel replied: "I don't know, we'll wait and see…. This is why I go to church on

8

Sundays." Plaintiff interpreted Wenzel's comment to mean that he would not report the errors and would thus be asking for divine forgiveness.

36. On information and belief, Defendant Wenzel never disclosed the errors to the IRS; however, Wenzel did disclose the errors to Defendant Randleman. As a result of the failure to report the errors, SCJ fraudulently received approximately $5,082,048 in total federal tax credits for FYE 1998, 1999 and 2000.

37. Subsequently, Defendant Wenzel forced Plaintiff to alter, destroy and change SCJ's business records so that the IRS errors could not be detected and to ensure that SCJ's business records corresponded to the IRS's reports. Each fraudulent report prepared by SCJ's Tax Department was submitted to the IRS via United States mail.

38. In 2002, Defendant Wenzel instructed Plaintiff and Susan K. Ruedinger (hereinafter "Ruedinger"), to structure a transaction that would allow SCJ to claim a tax deduction for the same goods sold twice. Such a transaction is commonly referred to as a Foreign Sales Corporation ("FSC") prepayment transaction and involves the exploitation of tax accounting rules regarding revenue recognition with the unique rules of a FSC. To accomplish this deceitful goal, Wenzel directed Plaintiff and Ruedinger to fabricate a business purpose for the transaction.

39. Defendant Wenzel, who sought to conceal from the IRS that SCJ attempted to fabricate a business purpose for the FSC transaction, instructed Plaintiff and Ruedinger to destroy all business records of SCJ associated with the FSC transaction in the event that "the IRS examines this transaction in the future." The destruction of documents occurred primarily during the completion of the FSC tax return after the prepayment transaction was completed during the first half of calendar year 2003.

9

40. On information and belief, the FSC prepayment transaction is currently in litigation between the IRS and SCJ.

41. On information and belief, SCJ received a tax benefit, in the form of reduced tax liability, in excess of $2,000,000 from the FSC prepayment transaction.

42. On information and belief, Defendant Wenzel personally benefitted from his concealment of the FSC transaction by receiving a significantly higher discretionary bonus from SCJ for his role in overseeing and directing the FSC transaction.

43. In 2004, Dr. H. Fisk Johnson (hereinafter "Johnson") became CEO of SCJ. Prior thereto, Johnson held the position of Chairman.

44. In approximately September 2004, Plaintiff was promoted into the position of State Tax Manager.

45. In approximately January 2005, SCJ adopted a document entitled "Standards of Conduct – Legal Compliance & Business Ethics." The first two paragraphs of the document on page 2 provide:

> These guidelines supplement the philosophy set forth in "This We Believe" and provide an overview of the requirements of the Corporate and U.S. Policy Manuals. Together, these materials are intended to provide guidance and general direction concerning law, policies and ethical standards that affect our everyday business practices and behavior.

> However, no general discussions can provide precise direction for all circumstances. Therefore, all employees must be aware of and comply with applicable law, both within and outside the United States, as well as applicable Company policies. If Company policy establishes a higher standard than the law, then we will comply with Company policy. The word "Company" in these guidelines means S.C. Johnson & Son, Inc., its subsidiaries, affiliates and joint ventures, in which the Company has a controlling interest or is the managing agent.

On page 4, the document provides in part:

10

As a privately owned corporation, S.C. Johnson & Son, Inc. does not issue stock that is publicly traded. However, Company employees are still personally required to comply with securities laws.

On page 7, the document provides in part:

No fraudulent, false or misleading entries shall be made for any reason in the books or accounts of the Company and all entries should contain an appropriate description of the underlying transaction.

On page 11, the document provides in part:

No employee may be retaliated against in any manner for reporting potential violations of laws, regulations, or Company policy, or for providing assistance in an investigation of such matters.

On page 12, the document provides in part:

No employee may be retaliated against (disciplined, discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in the terms and conditions of employment) because of any lawful act by the employee:

- To report an alleged violation of federal, state or local laws or regulations, either internally within the Company or externally to an appropriate government agency;
- To report an alleged violation of Company policy to the appropriate department within the Company; or
- To provide information or assistance in an investigation by the Company or government regarding any conduct which the employee reasonably believes constitutes a violation of federal, state or local law or regulations.

An employee who reasonably believes that he or she has been the object of retaliation by the Company or one or more of its employees should promptly file a complaint with Human Resources or the Law Department or through the Compliance Reporting Hotline.

Any employee who is determined to have retaliated against another employee in violation of these provisions will be subject to disciplinary action up to and including termination.

46. In approximately late January 2005, Defendant Wenzel instructed Plaintiff to prepare and fill out the IRS Form 5471 for FYE 2004. Plaintiff complied and provided the form to

11

Wenzel.

47. Approximately one week later, on or about February 6, 2005, Defendant Wenzel returned the Form 5471 to Plaintiff and instructed him to fraudulently alter an income statement by improperly netting numbers on the statement against an expense, instead of reporting the numbers individually.

48. The consequence of altering the Form 5471 demanded by Defendant Wenzel may have been a fraudulent financial benefit to SCJ of approximately $3,700,000.

49. Plaintiff refused Defendant Wenzel's demand, stating that he could not engage in such conduct because it would be a gross misrepresentation. Wenzel continued to insist that Plaintiff make the alterations; however, Plaintiff continually refused.

50. In response to Defendant Wenzel's continuing demands that Plaintiff commit tax fraud, Plaintiff approached Defendant Pappenfuss, another supervisor in SCJ's Tax Department, and complained that Wenzel was forcing him to fraudulently alter the Form 5471, but that he had refused.

51. On or about February 7, 2005, Defendant Pappenfuss left a memorandum for Plaintiff on his office chair instructing him to comply with Defendant Wenzel's demands to fraudulently alter the Form 5471.

52. Under duress, Plaintiff prepared the Form 5471 to comply with Defendant Wenzel's and Defendant Pappenfuss' instructions.

53. On or about February 9, 2005, Defendant Wenzel approved the fraudulently altered Form 5471 by initialing and dating the upper right corner of the form, and submitted it to the IRS via United States mail.

12

54.     In approximately June 2005, Defendant Pappenfuss fraudulently prepared an amended tax return for FYE 1998 and initialed same.  Upon information and belief, Pappenfuss prepared the amended return at the instruction of Defendants Wenzel and Randleman.

55.     The purpose of preparing the amended tax return was to take advantage of the IRS errors relating to SCJ's FYE 1998 by carrying back excess foreign tax credits in the amount of approximately $1,778,717 to FYE 1998 in order to fraudulently obtain a tax refund in that amount.

56.     On or about June 29, 2005, Defendant Randleman approved the amended tax return for FYE 1998 fraudulently prepared by Defendant Pappenfuss, signed the amended return, and submitted it to the IRS via United States mail.

57.     At the time he approved and signed the amended tax return for FYE 1998, Defendant Randleman knew of the IRS' errors relating to FYE 1998, 1999 and 2000 and, therefore, knew that SCJ was not entitled to the tax credits or a refund.

58.     In approximately early July 2007, Plaintiff had a detailed discussion with Defendant Pappenfuss in San Diego, California regarding an intercompany loan issue and a potential $30,000,000 exposure to SCJ if the State of Wisconsin asserted 100% apportionment on the income.  Plaintiff urged Pappenfuss to make a reserve for the exposure as required by FIN 48, but Pappenfuss merely told Plaintiff to let Defendant Wenzel know about the issue.  Plaintiff complied.

59.     From approximately Fall 2007 through Spring 2008, Plaintiff continued to stress the need for SCJ to set aside a reserve to cover potential exposure on the intercompany loan issue not only to Defendant Wenzel, but also to outside firms working with SCJ on the issue, including Deloitte & Touche, Price Waterhouse Coopers, and ReedSmith.  Wenzel continued to downplay the possibility of such an event and refused to make such a reserve.

13

60.     In approximately October 2007, Plaintiff had a meeting with Defendant Camilli. During the meeting, Plaintiff told Camilli that he believed Defendant Wenzel was creating a hostile work environment for him and that his tirades and threats of physical violence caused Plaintiff to fear for his personal safety.   Upon information and belief, Wenzel's harassing and threatening conduct toward Plaintiff was in response to Plaintiff's opposition to SCJ's Tax Department's fraudulent activity.

61.     In approximately December 2007, Plaintiff attended SCJ's Profit Sharing Day 2007, at which Johnson gave a speech to the entire company about "doing the right thing."   Johnson stated in part:

> At SCJ, this is not just business with us, it's personal.  I'm proud the people of this company have a long history of doing what is right.  …  The reason I repeat this so often is that I want to make sure that the new people coming in understand that we value this conscientious level of responsibility and have done so from the beginning. …[L]et me emphasize that my family genuinely wants you to do the right thing. The thing that is ethical.  The thing that is responsible.  The thing that carries on the values the company represents.

62.     On January 9, 2008, Defendant Camilli held a meeting with Plaintiff as a follow-up to their previous meeting in approximately October 2007.   Camilli stated that she investigated Plaintiff's complaints and found that Defendant Wenzel was not creating a hostile working environment and that, because Wenzel never actually attacked Plaintiff, Plaintiff had no reason to fear for his safety.  In response, Plaintiff told Camilli that if she thought Wenzel was "such a nice guy," there were a couple of things she should know about him.  Inspired by the speech Johnson gave in December 2007, Plaintiff then informed her of the errors contained within the IRS audit reports for FYE 1998, 1999 and 2000, SCJ's resulting receipt of over $5,000,000 in federal tax credits in FYE 1998, 1999 and 2000, Wenzel's demands for Plaintiff to subsequently alter and

14

destroy SCJ's business records to conceal the errors, and Wenzel's instruction that Plaintiff fraudulently prepare the Form 5471 in February 2005.

63.     During Plaintiff's meeting with Defendant Camilli on or about January 9, 2008, Camilli asked Plaintiff to provide documentation supporting his allegations of fraudulent tax filings. Plaintiff told Camilli that he had some of the documentation in his home and that he would need to obtain additional files from SCJ's Tax Department. Camilli asked Plaintiff if he would be able to obtain the files needed from the Tax Department. Plaintiff stated that it would raise questions if anyone saw him do that because the files related to international tax, a different area of the company. In response, Camilli told Plaintiff that he may need to obtain the files at night or over the weekend. Plaintiff stated that he would do so over the weekend and meet with her again the following Monday, January 14, 2008.

64.     On or about January 11, 2008, Plaintiff stayed late after work and made copies of the documents necessary to support his allegations, as requested by Defendant Camilli on or about January 9, 2008.

65.     On or about the morning of January 14, 2008, Plaintiff provided Defendant Camilli with the documentation she requested, which supported the allegations of fraudulent tax filings Plaintiff reported on or about January 9, 2008. Camilli asked Plaintiff if anyone saw him making copies or taking them. Plaintiff said "No," and told her that he came in over the weekend. During the meeting, Camilli mentioned that she spoke with an internal committee regarding the ethical concerns raised by Plaintiff's allegations. According to Camilli, that committee was comprised of Defendant Kosterman; Gary Akavickas, General Counsel; and Bill Striker, Head of Internal Audit.

66.     Later in the morning on or about January 14, 2008, Plaintiff received a telephone

call from Defendant Kosterman, where she stated that she spoke with Defendant Camilli about his allegations and asked Plaintiff if he would be able to obtain the documentation necessary to prove them. Before Plaintiff could respond, Kosterman told him that she did not want anyone in his department to know that he was getting the documents or cooperating in an investigation, so he should obtain the documents at night or over the weekend. Plaintiff then told Kosterman that he had done just that and had provided them to Camilli that morning. In response, Kosterman informed Plaintiff that the internal committee referred to by Camilli on January 14, 2008, decided to involve the service of a professional firm and that he should schedule a telephone conference with that firm so that no one in his department would know about it, preferably at night.

67.     On or about the morning of January 17, 2008, Plaintiff received a telephone call from Natalie H. Keller (hereinafter "Keller") of Kirkland & Ellis LLP, an international commercial law firm. Keller and Plaintiff proceeded to schedule a telephone conference for at or around 7:00 p.m. that night, which would also involve another attorney, Todd F. Maynes (hereinafter "Maynes"). Afterward, Plaintiff sent an email to Defendant Kosterman ensuring that he had permission to speak with Keller and Maynes. Kosterman responded that he did, again via email.

68.     At or around 7:00 p.m. on January 17, 2008, Plaintiff spoke by telephone with Keller and Maynes regarding the errors contained in the IRS's audit reports for FYE 1998, 1999 and 2000, the more than $5,000,000 in tax credits SCJ received as a result, Defendant Wenzel's instructions to alter and destroy business records to conceal the errors, Wenzel's instruction to fraudulently alter the Form 5471 in February 2005, and the documentation he provided to Defendant Camilli on January 14, 2008.

69.     On or about January 29, 2008, Plaintiff received an Officer's Award from SCJ in

recognition of his superior job performance.

70.     During a meeting in approximately March 2008, Defendant Wenzel informed Plaintiff that if he had any problems or concerns with anything occurring in SCJ's Tax Department that he should not discuss those problems or concerns with anyone outside of the department, but should rather discuss them with appropriate department personnel, adding, "You should not have discussions with others in Accounting or Human Resources," and that problems within SCJ's Tax Department "should be addressed here." Wenzel added that he knew Plaintiff "had discussions with Human Resources" and asked Plaintiff, "What do you wish to accomplish?" with those discussions. Wenzel became increasingly loud and physically aggressive toward Plaintiff during the meeting, prompting Plaintiff to leave his office in fear for his personal safety. Wenzel followed Plaintiff out of the office and continued to yell at Plaintiff in such a manner that it was easily overheard by others in SCJ's Tax Department.

71.     On several occasions after their meeting in approximately March 2008, Defendant Wenzel commented in front of Plaintiff and other SCJ employees that "certain individuals in the company think that we should be overpaying our tax or paying more tax" because it was the right thing to do.

72.     Throughout 2008, Defendant Wenzel became increasingly combative and confrontational with Plaintiff, and he began to unfairly and falsely accuse Plaintiff of performance issues.

73.     In March 2008, Plaintiff was unexpectedly provided with a six-month performance review prepared by Ruedinger, containing negative information. It was not normal procedure for six-month performance reviews to be administered and, prior to March 2008, Plaintiff never

17

received, nor ever heard of an SCJ employee receiving, a mid-year performance review.

74.     On or about March 12, 2008, Plaintiff met with Defendant Camilli to discuss the performance review. During the meeting, Plaintiff explained that the review contained several false accusations regarding the book accounting for a state income tax project, and he described his deteriorating working relationship with Defendant Wenzel. Camilli stated that she spoke with Ruedinger and that the review characterized Plaintiff's job performance as "effective."

75.     On or about March 14, 2008, Plaintiff met with Defendant Kosterman, where he informed her of the errors contained in the IRS audit reports for FYE 1998, 1999 and 2000, the more than $5,000,000 in tax credits SCJ received as a result of those errors, the subsequent alterations and destruction of business records to conceal the errors, Defendant Wenzel's instructions that Plaintiff fraudulently alter the Form 5471 in February 2005, Wenzel's demands that Plaintiff and Ruedinger impermissibly destroy documents relating to the FSC prepayment transaction, Ruedinger's unfounded six-month performance review, Plaintiff's deteriorating working relationship with Wenzel, Plaintiff's fears of reprisal from Wenzel, and SCJ's fraudulent failure to pay income tax in Wisconsin for nearly fifteen years through profit-shifting.

76.     In approximately April 2008, Plaintiff met with Defendant Camilli to discuss his request for a salary adjustment to bring his salary more in line with the market, as he had first requested in approximately December 2007, as in or around that month, Briggs & Stratton hired a State Tax Manager at $150,000 per year, whereas Plaintiff earned approximately $103,000 per year. Camilli stated that she would have to discuss it with Defendant Wenzel.

77.     In approximately early May 2008, Plaintiff asked Defendant Wenzel about the possibility of a raise. In response, Wenzel stated that he could see giving Plaintiff a ten percent

18

raise in light of his accomplishments, specifically referring to a Pennsylvania tax refund and obtaining a property tax exemption, but that "given some of the problems we have had in the past few months, I don't think that will be happening this year." Upon information and belief, Wenzel's reference to "the past few months" referred to Plaintiff's disclosure of SCJ's Tax Department's fraudulent activity to Defendants Camilli and Kosterman.

78.     On or about May 14, 2008, Plaintiff met with Defendant Kosterman to review the discussion they previously held on or about March 14, 2008. During the May 14, 2008 meeting, Kosterman told Plaintiff that neither Defendant Wenzel nor any other employee of SCJ committed any wrongdoing, and that he was being "paranoid" by thinking that he would suffer reprisal from Wenzel or anyone else, although she acknowledged that Plaintiff's working relationship with Wenzel was deteriorating. She recommended that Plaintiff and Wenzel meet with a coach to improve in their relationship and told him that Defendant Camilli would follow up with him.

79.     On or about July 28, 2008, Plaintiff met with Defendant Camilli to discuss his deteriorating relationship with Defendant Wenzel. Camilli stated that Defendant Kosterman had not followed up with her, contrary to Kosterman's promise.

80.     On or about August 26, 2008, Plaintiff met with Defendant Camilli as a follow-up to their meeting on or about July 28, 2008, as his relationship with Defendant Wenzel had not improved. During the meeting, Plaintiff outlined his concerns about the intercompany loan issue and the potential $30,000,000 exposure to SCJ if the State of Wisconsin asserted 100% apportionment on the income. Plaintiff told Camilli that if he was unable to convince Wenzel to agree to set aside an appropriate reserve, he would have to pursue the issue with an internal audit as SCJ was adopting FIN 48 during that fiscal year. On information and belief, Camilli notified

19

Wenzel of Plaintiff's concerns expressed during this meeting.

81.    On or about August 28, 2008, Plaintiff met with Defendants Camilli and Wenzel to discuss the need for SCJ to create a Wisconsin tax reserve.  In the meeting, Wenzel first accused Plaintiff of not telling him about the issue, and later failing to communicate the importance of the issue to him.  Wenzel was visibly agitated, confrontational and physically agressive toward Plaintiff during this meeting, causing Plaintiff to fear for his personal safety.

82.    On or about September 10, 2008, Plaintiff met with Defendant Camilli regarding his ongoing fears of reprisal and personal safety, based on the August 28, 2008 meeting with Defendant Wenzel.

83.    On or about September 23, 2008, Defendant Wenzel became visibly angry and yelled at Plaintiff during a brief discussion between them regarding the intercompany loan issue in front of Kevin J. Zmolek, Tax Consultant for Ernst & Young LLP.  Ernst & Young LLP was, and is, SCJ's external, independent financial auditor.  Until Plaintiff raised the issue with the auditor, the auditor was not yet aware of the potential loan exposure issue despite Wenzel's earlier assertions that it had to be addressed urgently.

84.    On or about September 23, 2008, Plaintiff received a negative "needs improvement" performance evaluation from Defendant Wenzel.   In response, Plaintiff contacted Defendant Camilli, claiming that the performance evaluation contained false allegations and constituted retaliation in response to his whistleblowing activities.

85.    Upon information and belief, the "needs improvement" performance evaluation prepared by Defendant Wenzel was reviewed by Defendants Randleman and Camilli prior to Plaintiff's receipt of same.

86.     On or about October 3, 2008, Plaintiff provided Defendant Camilli with a detailed, written response to the negative performance evaluation he received on or about September 23, 2008.

87.     On or about October 3, 2008, Defendants Kosterman and Camilli, and Akavickas met with Plaintiff to reinforce their findings of no illegal activity on the part of Defendant Wenzel and/or SCJ's Tax Department.

88.     On or about October 10, 2008, Defendant Camilli informed Plaintiff that the negative performance review he received on or about September 23, 2008 would be investigated.

89.     In approximately early November 2008, Plaintiff again informed Camilli, in writing, of his belief that the performance review he received on or about September 23, 2008 was retaliatory in nature and stated that he would contact the appropriate state or federal agency regarding the RICO Defendants' actions at or near the end of November 2008 if SCJ did not take any actions to cure Defendant Wenzel's retaliation, as he believed he was under the statute of limitations set forth in the Sarbanes-Oxley Act, 15 U.S.C. § 7201, *et. seq.*, as amended.

90.     On or about November 19, 2008, Defendant Wenzel instructed Plaintiff not to have any discussions with any member of Ernst & Young LLP regarding any financial accounting concerns he may have.

91.     At or about 10:30 a.m., on or about December 18, 2008, Plaintiff met with Defendants Kosterman and Camilli.  Kosterman informed Plaintiff that an investigation was made into the "needs improvement" performance review provided by Defendant Wenzel on September 23, 2009, and that it was determined that the review was provided in retaliation for Plaintiff's reporting the tax fraud occurring in SCJ's Tax Department to upper management and that the

Case 2:10-cv-00103-WEC   Filed 02/05/10   Page 21 of 49   Document 1

performance review was therefore revoked and invalidated. Finally, Kosterman asked Plaintiff to "finally drop the matter and move forward," in relation to his complaints of tax fraud. In response, Plaintiff told Kosterman and Camilli that he could not drop the matter and would be filing a whistleblower complaint with the United States Department of Labor (hereinafter "DOL") and that all of the documentation he provided to Camilli in approximately January 2008 would be attached thereto. Neither Kosterman nor Camilli expressed any objections to Plaintiff's possession of such documentation or his intention to provide them to the DOL.

92. During Plaintiff's meeting with Defendants Kosterman and Camilli on or about December 18, 2008, Plaintiff renewed his request that his salary be adjusted to be in line with the market and that SCJ pay Plaintiff's attorney's fees related to his challenge of Defendant Wenzel's retaliatory performance review. Since approximately December 2007, Plaintiff had periodically requested that his salary be adjusted; however, his request was never granted. As of December 2008, Plaintiff's salary was approximately $103,000 annually, while the market average was approximately $130,000 annually. Also during this meeting, Kosterman and Camilli proposed the possibility of transferring Plaintiff from SCJ's Tax Department into its Business Planning and Development. Plaintiff stated that he was willing to explore and consider that possibility.

93. At or about 12:30 p.m., on or about December 18, 2009, Defendants Kosterman and Camilli contacted Plaintiff via telephone and informed him that he would receive a retroactive merit increase in salary. Additionally, Kosterman and Camilli agreed to provide Plaintiff with a one-time partial payment of his attorney's fees if Plaintiff signed a full release of claims and a confidentiality agreement. Upon information and belief, this offer was jointly created by Kosterman, W. Lee McCollum, SCJ's Executive Vice President and Chief Financial Officer, and Defendant Eckhardt.

94.     At or about 4:00 p.m. on or about December 18, 2008, Plaintiff contacted Defendant Camilli via telephone and rejected the offer she previously relayed along with Defendant Kosterman. In response, Camilli stated that Plaintiff would still receive a retroactive merit increase in salary and that Defendant Wenzel's "needs improvement" performance review would "disappear."

95.     On or about December 18, 2008, Plaintiff filed a whistleblower complaint with the DOL under the Sarbanes-Oxley Act, DOL Case No. 2009-SOX-00033. Attached to the complaint were financial and tax documents and information, as well as internal communications supporting Plaintiff's complaint. Plaintiff had previously obtained and provided these same documents to Defendant Camilli on January 14, 2008, per her request.

96.     In approximately January 2009, Plaintiff held a meeting with Defendant Kosterman in Kosterman's office. During the meeting, Plaintiff retracted his request for a salary adjustment for fear that it could be wrongly interpreted as an attempt to monetarily benefit from reporting SCJ's Tax Department's fraudulent actions. In response, Kosterman stated that she never believed Plaintiff was attempting to enrich himself through his actions, and restated her belief that no illegal activity ever occurred. Plaintiff stated that her view was incorrect, in that illegal activity had taken place. In response, Kosterman told Plaintiff that she knew and understood that he genuinely he was right and that what he reported was illegal.

97.     In January 2009, Plaintiff informed the IRS and the United States Department of Justice of the tax fraud being committed in SCJ's Tax Department.

98.     On or about January 9, 2009, United States Occupational Safety and Health Administration Area Director George Yoksas notified Plaintiff's counsel that SCJ is not a covered

entity under the Sarbanes-Oxley Act.

99.     On or about January 29, 2009, Plaintiff filed his first amended complaint in DOL Case No. 2009-SOX-00033 supporting his claim that employees of SCJ violated the Sarbanes-Oxley Act.

100.    In approximately early February 2009, Plaintiff learned that SCJ's Tax Department intended to file a second amended tax return for FYE 1998 for a refund of approximately $2,306,841.

101.    On or about February 4, 2009, Plaintiff sent an email to Johnson asking to meet with him regarding the RICO Defendants' actions and stating his belief that SCJ employees were committing immoral and potentially illegal acts.

102.    Approximately one week later, on or about February 10, 2009, Plaintiff received an email from Defendant Kosterman in which she informed Plaintiff that Johnson forwarded Plaintiff's email from on or about February 4, 2009, to her attention.  Therein, she told Plaintiff that the matter was closed and "it is appropriate for you and the Company to move beyond these issues." However, she also stated that if Plaintiff learned of any other activity that may be unlawful, he should bring it to her attention.

103.    Also on or about February 10, 2009, Defendant Camilli emailed Plaintiff to state in part, "I want to reinforce that the Company has looked into the ethical concerns you have brought forward last year.  Nothing illegal or fraudulent was found.  While we appreciate you raised these concerns, they have been addressed and we need to move forward."

104.    On or about February 17, 2009, the DOL determined in DOL Case No. 2009-SOX-00033 that as a privately-held corporation SCJ is not a covered entity and that Plaintiff is not an

"employee" within the meaning of the Sarbanes-Oxley Act.

105.    On or about March 2, 2009, Plaintiff's counsel emailed copies of the documents filed with the DOL in DOL Case No. 2009-SOX-00033 to SCJ's legal counsel.  SCJ's legal counsel did not express any objection to Plaintiff's possession of such documents.

106.    In approximately March 2009, Defendant Wenzel gave a Power Point presentation to the employees of SCJ's Tax Department stating that SCJ adopted the provisions of the Sarbanes-Oxley Act.

107.    On or about March 10, 2009, SCJ's Tax Department fraudulently filed a second amended return for FYE 1998.  The return was signed by Defendant Eckhardt and submitted to the IRS via United States mail.

108.    The purpose of the second amended return was the same as the first amended return filed by Defendant Randleman on or about June 29, 2005: to carry back excess foreign tax credits to FYE 1998 to fraudulently obtain a tax refund.  Upon information and belief, the refund requested in the second amended return for FYE 1998 was in the amount of approximately $2,306,841.

109.    On information and belief, the RICO Defendants personally benefitted from the amended tax returns SCJ's Tax Department filed to capitalize on the IRS' errors relating to FYE 1998, 1999 and 2000, as they received significantly higher discretionary bonuses from SCJ in those years.

110.    On or about March 19, 2009, Plaintiff provided a five-page memorandum to SCJ's counsel, thoroughly detailing his concerns regarding the IRS mistakes for FYE 1998, 1999 and 2000, the more than $5,000,000 in unwarranted foreign tax credits the errors created, and the fraudulent actions taken by the RICO Defendants to conceal, abuse and benefit from those errors, as

well as their ramifications.

111.     On or about March 21, 2009, Defendant Camilli confirmed with Plaintiff that SCJ received the March 19, 2009 memorandum and that Defendant Kosterman was reviewing same.

112.     In approximately March 2009, Defendant Kosterman attempted to silence Plaintiff and interfere with Plaintiff's employment by conditionally offering him the opportunity to resign his employment with SCJ in exchange for one year of salary and benefits if he agreed to release any and all legal claims and agreed to confidentiality.  Plaintiff refused the offer.

113.     On or about April 9, 2009, Defendant Camilli and Beth P. Klimczak (hereinafter "Klimczak"), SCJ's Tax Counsel – Accounting and Control, met with Plaintiff and informed him that he was being investigated for misconduct in connection with his taking of confidential business documents and disclosure of those documents outside the company.  Camilli then asked Plaintiff if he took any confidential business documents and disclosed them outside of the company.  Plaintiff responded, "No."  Camilli then asked Plaintiff if he had any confidential business documents at his home.  Again, Plaintiff responded, "No."  Camilli then asked if he had given any confidential business documents to his attorney.  Plaintiff responded, "No."  Plaintiff then asked Camilli to define "confidential business document."  Camilli stumbled before stating, "A confidential document that shouldn't be disclosed."  Plaintiff responded, "I am not sure what you mean when you say confidential business documents.  You know full well that I attached documents to the Department of Labor filing as proof of fraud to protect my rights.  I don't consider that to be confidential documents, but I don't know if you do."  The conversation then stopped and Camilli told Plaintiff that he was being placed on administrative leave while his actions were investigated and that he should go home.

114.    After Plaintiff's meeting with Defendant Camilli and Klimczak on or around April 9, 2009, Camilli accompanied Plaintiff back to his office.  While in Plaintiff's office, Plaintiff again stated to Camilli that she knew about the documents attached to his DOL complaint and that he did not consider those documents to be confidential, but that if she considered them to be confidential, she should say so.  Camilli responded, "Mike, if you have more to say, we should go back into that room and say it."  Camilli then watched as Plaintiff turned off his computer and followed him to Klimczak's office where he dropped off documents he was working on.  Plaintiff was then escorted out of the building and to his car by security personnel.

115.    As of December 18, 2008, Defendants Camilli and Kosterman were aware that Plaintiff intended to file a whistleblower complaint with the DOL with the documents he directly provided to Camilli on or about January 9, 2008, attached; however, neither Camilli or Kosterman, nor any other RICO Defendant ever objected to his possession of those documents, his intention to provide those documents to the DOL, or his subsequent provision of those documents to the DOL until on or about April 9, 2009, after Plaintiff provided SCJ's legal counsel with the March 19, 2009 memorandum detailing the fraudulent actions of SCJ's Tax Department, and after Plaintiff refused Kosterman's offer to resign in exchange for keeping quiet.

116.    At a meeting on or about April 10, 2009, the day after Plaintiff was suspended for investigation, Defendant Camilli, with Klimczak present, informed Plaintiff that his employment was terminated for taking confidential business documents and disclosing them outside of the company and for not being truthful during the investigation regarding his alleged misconduct. When referring to the business records at issue, Camilli showed Plaintiff the documents he had previously provided to the DOL on or about December 18, 2008, containing the same exhibit

27

stamps he had placed on them.

117.    On information and belief, the decision to terminate Plaintiff's employment was made by Defendants Eckhardt and Kosterman.

118.    At no time prior to Plaintiff's termination did Plaintiff take or copy any documentation relating to SCJ's Tax Department's fraudulent actions beyond what was directly requested by Defendants Camilli and Kosterman.

119.    At no time prior to Plaintiff's termination did Plaintiff provide any documentation relating to SCJ's Tax Department's fraudulent actions to any entity outside of SCJ, with the exception of the DOL.

120.    On or about April 11, 2009, Plaintiff received a termination letter from Defendant Camilli dated April 10, 2009.  The letter stated: "This letter will confirm what I informed you in our meeting today.  You were terminated effective immediately for two independent reasons.  First, you inappropriately took confidential SC Johnson Business Documents.  Additionally, you disclosed those documents outside SC Johnson.  Secondly, you were not truthful with us during our investigation regarding this misconduct."  The letter also requested that Plaintiff return all SCJ property in his possession via self-addressed, stamped return envelopes provided with the letter.

121.    On or about April 14, 2009, Plaintiff returned all SCJ property in his possession, including his SCJ identification badge, phone card, credit card and parking pass, as instructed by Defendant Camilli's April 10, 2009 termination letter.

122.    On or about the morning of April 28, 2009, while at his attorney's office, Plaintiff received a letter from SCJ's counsel, dated April 17, 2009, demanding his return of any and all documentation originating with SCJ or any employee thereof.

123.     Upon Plaintiff's return home that day, he was served with a copy of a complaint filed by SCJ in Racine County Circuit Court, claiming replevin of company property, documentation and confidential information, breach of contract and conversion.  The claims referred directly to the items Plaintiff returned to Defendant Camilli on or about April 14, 2009, and to the documentation Plaintiff previously provided to Camilli and, subsequently to the DOL, including: documents prepared by the IRS, documents containing SCJ's financial and/or tax information, documents consisting of internal communications and notes, and other documents Plaintiff created that contain or relate to SCJ's tax information.

124.     On or about April 29, 2009, Plaintiff filed a second amended complaint in DOL Case No. 2009-SOX-00033.

125.     Plaintiff subsequently withdrew his claim in DOL Case No. 2009-SOX-00033.

126.     In an article titled "Ex-employee plans to sue SCJ," published on or about May 20, 2009 in the Racine Journal Times.com, SCJ stated falsely:  "SC Johnson has never committed fraud related to these allegations," adding, "That's patently false."  These statements were printed in direct response to Plaintiff's allegations that the RICO Defendants committed tax fraud, cast Plaintiff as a liar, and were made with the intention of humiliating Plaintiff and damaging his professional reputation.

127.     In an article titled "Ex-employee plans to sue SCJ," published on or about May 20, 2009 in the Racine Journal Times.com, SCJ's spokesperson Kelly Semrau (hereinafter "Semrau") falsely stated that Plaintiff was not retaliated against for complaining of SCJ's Tax Department's tax fraud.  This statement was printed in response to Plaintiff's accusations that the RICO Defendants terminated him for being a whistleblower, casts Plaintiff as a liar, and was made with

29

the intention of humiliating Plaintiff and damaging his professional reputation.

128.    In an article titled "Ex-employee plans to sue SCJ," published on or about May 20, 2009 in the Racine Journal Times.com, Semrau stated falsely, "It was thoroughly investigated, and he wasn't terminated until April 10 when it was discovered that other materials had been taken," referring to "confidential SCJ business documents."  This statement casts Plaintiff as a liar and was made with the intention of humiliating Plaintiff and damaging his professional reputation.

129.    In an article titled "SCJ accuses ex-employee of defamation," published on or about June 4, 2009 in the Racine Journal Times.com, SCJ falsely stated: "But when Mr. DeGuelle, a former employee, makes false and defamatory allegations about SCJ that strike at the very heart of its hard-earned reputation, SCJ has little choice but to point out the errors and pursue its options for redress."  This statement directly and publicly replied to a letter sent to SCJ's legal counsel dated May 22, 2009, requesting retraction of SCJ's statements, casts Plaintiff as a liar, and was made with the intention of humiliating Plaintiff and damaging his professional reputation.

130.    In an article title "SCJ accuses ex-employee of defamation," published on or about June 4, 2009 in the Racine Journal Times.com, SCJ falsely stated: "Because the stolen property is related to SC Johnson's business, the company decided to pursue the matter in civil court instead of the criminal system."  This statement falsely suggests that Plaintiff is guilty of criminal conduct and was made with the intention of humiliating Plaintiff and damaging his professional reputation.

131.    In an article titled "SCJ accuses ex-employee of defamation," published on or about June 4, 2009 in the Racine Journal Times.com, SCJ falsely stated: "Business papers, while so important to us, and competitively put as at a significant disadvantage, do not rise to the top of the criminal system, so we decided to go civil."  This statement falsely suggests that Plaintiff is guilty

Case 2:10-cv-00103-WEC   Filed 02/05/10   Page 30 of 49   Document 1

of criminal conduct and was made with the intention of humiliating Plaintiff and damaging his professional reputation.

132.     In an article titled "SCJ accuses ex-employee of defamation," published on or about June 4, 2009 in the Racine Journal Times.com, SCJ falsely stated: "Additionally, in civil court, SCJ was able to file the suit itself, instead of having to make a case to law enforcement and the District Attorney's Office that the alleged conduct rises to the level of a crime."  This statement falsely suggests that Plaintiff is guilty of criminal conduct and was made with the intention of humiliating Plaintiff and damaging his professional reputation.

133.     As these false and inflammatory statements by SCJ were published in print and online, other media outlets picked up the story and continued to further propagate the false and defamatory information through the Associated Press.

134.     On or about June 5, 2009, Avvo News published at www.avvo.com additional false statements by SCJ that defamed Plaintiff:

(a) "The ex-employee is being accused of taking company documents and then asking for money from SC Johnson for their safe delivery and return, according to The Journal Times."

(b) "He is charged with passing on private documents to a third party, making untrue statements and refusing to return the papers he initially reportedly took."

135.     On or about June 12, 2009, Today's TMJ4 published at www.todaystmj4.com/news/local additional false statements by SCJ that defamed Plaintiff:

(a) "S.C. Johnson & Son, Inc. has added defamation allegations to its civil lawsuit against a former employee it accuses of stealing documents."

31

(b) "The Racine company initially sued Michael DeGuelle in April, saying he demanded a payoff to return the documents."

136. On or about June 5, 2009, WKOW TV published at www.wkowtv.com additional false statements by SCJ that defamed Plaintiff:

(a) "S.C. Johnson & Son, Inc. has added defamation allegations to its civil lawsuit against a former employee it accuses of stealing documents."

(b) "The Racine company initially sued Michael DeGuelle in April, saying he demanded a payoff to return the documents."

137. On or about June 6, 2009, the Green Bay Press Gazette published at www.greenbaypressgazette.com additional false statements by SCJ that defamed Plaintiff:

(a) "S.C. Johnson & Son, Inc. has added defamation allegations to its civil lawsuit against a former employee it accuses of stealing documents."

(b) "The Racine company initially sued Michael DeGuelle in April, saying he demanded a payoff to return the documents."

138. On or about June 5, 2009, Midwest Communications, Inc. published at http://w20.wozz.com/news/2009/jun/05 and http://w20.wncy.com/news/2009/jun/05 an additional false statement by SCJ that defamed Plaintiff: "SC Johnson sued Michael DeGuelle in late April, saying he stole company documents and then demanded a payoff for returning them."

139. At the time it made the defamatory statements about Plaintiff, SCJ knew they were false and/or recklessly disregarded the falsity of the statements but continued to widely disseminate the statements.

140. By letter dated June 25, 2009, pursuant to Wis. Stats. § 895.05(2), Plaintiff

32

demanded that SCJ "correct and retract its libelous statements regarding Mr. DeGuelle in various media outlets," specifying the false statements set forth in paragraphs 125 – 131 above.

141. By letter dated June 26, 2009, SCJ responded to Plaintiff that the specified statements were not "false and defamatory, and [SCJ] will not be issuing any retraction."

142. On information and belief, the RICO Defendants provided the information underlying SCJ's lawsuit against Plaintiff in Racine County Court, as well as SCJ's false and inflammatory statements made to various media outlets regarding Plaintiff.

143. As a result of SCJ's lawsuit against Plaintiff and its false and inflammatory statements made to various media outlets about Plaintiff, Plaintiff has remained unable to gain employment in any manner of tax position subsequent to his termination, despite his continuous efforts and the apparent inability of suitable employers to fill positions for which Plaintiff is exceptionally qualified.

## RICO ALLEGATIONS

144. Plaintiff Michael J. DeGuelle realleges and incorporates by reference paragraphs 1 – 143 as if fully set forth herein.

145. As detailed above in paragraphs 12 – 142, Defendants Wenzel, Pappenfuss, Randleman, Camilli, Kosterman and Eckhardt (the "RICO Defendants") conducted or participated in the conduct of an enterprise, SCJ, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

146. Alternatively, the RICO Defendants, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise, SCJ, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). The actions of the RICO

33

Defendants as against Plaintiff, and as described above, were in furtherance of the RICO Defendants' conspiracy and in violation of 18 U.S.C. § 1962(d).

## THE ENTERPRISE

147.    SCJ was and is the passive instrument of the RICO Defendants' racketeering activity and constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), separate and distinct from the individual RICO Defendants named herein.

148.    From approximately 2000 and continuing through April 28, 2009, the RICO Defendants, as well as others known or unknown, being persons employed by and associated with SCJ, which was and is engaged in and the activities of which affected and affect interstate commerce, unlawfully and knowingly conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity, that is, through the commission of two or more racketeering acts set forth herein.

149.    Plaintiff seeks to prohibit the RICO Defendants from utilizing the pattern of unlawful conduct in which they have continually engaged during the relevant time period.

150.    The pattern of racketeering engaged in by the RICO Defendants involved at least two separate but related acts of racketeering activity, carried out from approximately 2000 through April 28, 2009.

151.    Plaintiff was directly injured by the RICO Defendants' acts of racketeering activity.

## PREDICATE ACTS & THE PATTERN OF RACKETEERING ACTIVITY

152.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1512 (relating to tampering with a witness, victim, or an informant) 18 U.S.C. § 1513 (relating to retaliating against a witness,

34

victim, or an informant) and 18 U.S.C. § 1519 (relating to destruction, alteration, or falsification of records in Federal investigation and bankruptcy). As set forth below, the RICO Defendants engaged in conduct violating 18 U.S.C. §§ 1341, 1512, 1513 and 1519 to effectuate their unlawful scheme.

153. The RICO Defendants' acts were not isolated, but rather formed a pattern of conduct through which the RICO Defendants used the enterprise, SCJ, to defraud the IRS and United States taxpayers for personal, monetary gain, and to silence Plaintiff from complaining about and exposing such illegal and fraudulent acts.

154. The pattern of the RICO Defendants' illegal racketeering activity, as defined by 18 U.S.C. § 1961(1) and (5), and 18 U.S.C. §§ 1341, 1512, 1513 and 1519, are based on the following facts:

a. On or about December 6, 2000, Defendant Wenzel received erroneous IRS audit reports for FYE 1998, 1999 and 2000. On or about December 15, 2000, Wenzel provided the audit reports to Plaintiff for his review, through which Plaintiff discovered errors that resulted in a significant tax overstatement and the IRS erroneously granting SCJ approximately $5,082,048 in foreign tax credits to which it was not entitled.

b. In approximately January 2001, Plaintiff approached Defendant Wenzel regarding the errors and asked him how he wanted to remedy same and what he planned to tell the IRS. Wenzel replied: "I don't know, we'll wait and see. This is why I go to church on Sundays."

c. In approximately January 2001, Defendants embarked upon an unlawful scheme and agreement to defraud the IRS and United States taxpayers by committing predicate acts to conceal, abuse and indirectly benefit from, the errors contained within the IRS audit reports relating to SCJ's

35

FYE 1998, 1999 and 2000.

d.      Defendant Wenzel, despite Plaintiff's inquiry, never disclosed the errors to the IRS, thereby allowing SCJ, the corporate enterprise, to fraudulently receive approximately $5,082,048 in foreign tax credits for FYE 1998, 1999 and 2000.

e.      To conceal SCJ's fraudulent receipt of the tax credits for FYE 1998, 1999 and 2000, Defendant Wenzel forced Plaintiff to alter and destroy SCJ's business records so that the IRS errors could not be detected, to ensure that SCJ's business records corresponded to the IRS's erroneous reports and to ensure that SCJ's subsequent federal tax returns corresponded to the IRS's erroneous reports.

f.      Each subsequent, fraudulently altered audit report was submitted to the IRS via United States mail.

g.      Each subsequent, fraudulently altered federal tax return was submitted to the IRS via United States mail.

h.      In approximately late January 2005, Defendant Wenzel instructed Plaintiff to prepare an IRS Form 5471. Plaintiff complied and provided the form to Wenzel. Approximately one week later, on or about February 6, 2005, Wenzel returned the form to Plaintiff and instructed him to fraudulently modify the form. Specifically, Wenzel instructed Plaintiff to alter an income statement by improperly netting numbers on the statement against an expense, instead of reporting the numbers individually.

i.      Plaintiff refused Defendant Wenzel's demand; however, Wenzel continued to insist that Plaintiff make the alterations. In response, Plaintiff approached Defendant Pappenfuss and informed him of Wenzel's demand and his refusal to comply. On or about February 6, 2005,

Case 2:10-cv-00103-WEC   Filed 02/05/10   Page 36 of 49   Document 1

Pappenfuss left a memorandum for Plaintiff on his office chair instructing him to comply with Wenzel demand that he fraudulently alter the Form 5471.

j.      On or about February 9, 2005, Defendant Wenzel approved the fraudulently altered Form 5471 by initialing and dating the upper right corner of the form and submitted it to the IRS via United States mail.

k.      The consequence of the fraudulent alteration demanded and approved by Defendants Wenzel and Pappenfuss may have created a financial benefit to SCJ of approximately $3,700,000.

l.      In approximately June 2005, Defendant Pappenfuss prepared a fraudulent amended tax return for FYE 1998 and initialed same.  The purpose of the amended return was to take advantage of the IRS errors relating to FYE 1998 by carrying-back excess foreign tax credits from FYE 2004 to FYE 1998 in order to fraudulently obtain a tax refund for SCJ of approximately $1,778,717.

m.      On or about June 29, 2005, Defendant Randleman approved the amended tax return for SCJ for FYE 1998 fraudulently prepared by Defendant Pappenfuss, signed the amended return, and submitted it to the IRS via United States mail.

n.      During a meeting with Defendant Camilli on or about January 9, 2008, Plaintiff informed Camilli of the errors contained within the IRS audit reports relating to SCJ's FYE 1998, 1999 and 200, Defendant Wenzel's knowing and fraudulent concealment of those errors, SCJ's receipt of over $5,000,000 in federal tax credits for FYE 1998, 1999 and 2000 as a result of those errors, Wenzel's instructions to alter and destroy SCJ's business records, and Wenzel's instructions to fraudulently prepare the Form 5471 in February 2005.  In response, Camilli asked Plaintiff to

secure documentation demonstrating same when no one would see him.

o.  Plaintiff provided Defendant Camilli with documentation on or about January 14, 2008, explaining, supporting and demonstrating the IRS errors and the actions of Defendant Wenzel and others in concealment and furtherance of those errors, as she had requested.

p.  In approximately March 2008, Plaintiff received a six-month performance review from Ruedinger.  Prior to this date, Plaintiff never received a mid-year review.  In the review, Defendant Wenzel made false, negative accusations about Plaintiff's performance.

q.  On or about March 14, 2008, Plaintiff met with Defendant Kosterman.  At the meeting, Plaintiff informed Kosterman of the errors contained in the IRS audit reports relating to SCJ's FYE 1998, 1999 and 2000, the more than $5,000,000 in tax credits for FYE 1998, 1999 and 2000 SCJ received, Defendant Wenzel's instructions to Plaintiff to alter and destroy SCJ's business records to conceal the errors, Wenzel's instruction that Plaintiff fraudulently alter the Form 5471 in February 2005, the negative six-month performance review he received, his deteriorating working relationship with Wenzel, and his fears of reprisal from Wenzel.

r.  On or about May 14, 2008, Plaintiff met with Defendant Kosterman to discuss the information he provided to her two months earlier on or about March 14, 2008.  In the May 14, 2008 meeting, Kosterman told Plaintiff that neither Defendant Wenzel, nor any other SCJ employee, committed any wrongdoing and that he was simply being "paranoid."

s.  On or about September 23, 2008, Plaintiff received a negative "needs improvement" performance evaluation from Defendant Wenzel.  The evaluation was reviewed and approved by Defendants Randleman and Camilli prior to Plaintiff's receipt of same.

t.  On or about October 3, 2008, Defendants Kosterman and Camilli, as well as Gary

38

Akavickas, met with Plaintiff to reinforce their findings of no illegal activity on the part of Defendant Wenzel or any other employee of SCJ.

u.      On or about December 18, 2008, Plaintiff met with Defendants Kosterman and Camilli. Kosterman stated that based on information attained through an investigation, the performance review Defendant Wenzel provided on or about September 23, 2008, was provided in retaliation for Plaintiff's reporting the tax fraud occurring in SCJ's Tax Department to upper management and that the review was therefore revoked and invalidated. Finally, Kosterman asked Plaintiff to "finally drop the matter and move forward." In response, Plaintiff told Kosterman and Camilli that he could not drop the matter and would be filing a whistleblower complaint with the DOL, attaching all the documentation he provided to Camilli on or about January 14, 2008.

v.      On or about December 18, 2008, Defendants Kosterman and Camilli provided Plaintiff with a retroactive merit increase in salary. Plaintiff was also offered partial compensation for attorney's fees he had accrued to date, in exchange for a full release of claims and signing a confidentiality agreement; however, Plaintiff refused.

w.      On or about December 18, 2008, Plaintiff filed a whistleblower complaint with the DOL, DOL Case No. 2009-SOX-00033, attaching the same financial and tax documents and information, as well as internal communications between employees of SCJ, that Defendant Camilli requested on or about January 9, 2008 and that Plaintiff provided to Camilli on or about January 14, 2008. This documentation explained and demonstrated the errors contained within the IRS audit reports for SCJ's FYE 1998, 1999 and 2000, the over $5,000,000 in federal tax credits for FYE 1998, 1999 and 2000 SCJ received as a result of those errors, and the subsequent actions taken by the RICO Defendants to conceal the errors.

x.        On or about March 10, 2009, Defendant Eckhardt approved and fraudulently filed a second amended return for FYE 1998, similar to that filed on or about June 29, 2005 by Defendant Randleman. The purpose of the amended return was to take advantage of the IRS errors relating to FYE 1998 by carrying-back excess foreign tax credits from FYE 2004 to FYE 1998 in order to fraudulently obtain a tax refund for SCJ of approximately $2,306,841. Eckhardt submitted the fraudulent return to the IRS via United States mail.

y.        In approximately March 2009, Defendant Kosterman conditionally offered Plaintiff the opportunity to resign his employment with SCJ in exchange for one year's salary and benefits, if he agreed to a full release of claims against SCJ and confidentiality. Plaintiff declined.

z.        On or about April 9, 2009, Defendant Camilli placed Plaintiff on indefinite administrative leave while he was investigated for taking confidential documentation and releasing them outside of SCJ. Plaintiff possessed those documents pursuant to Camilli's request and subsequently released them to the DOL to initiate an investigation into the RICO Defendants' illegal and fraudulent actions.

aa.        At a meeting on or about April 10, 2009, Defendant Camilli terminated Plaintiff's employment with SCJ for allegedly taking confidential information, releasing that information outside of SCJ, and for not being truthful during the investigation into those actions.

bb.        The decision to terminate Plaintiff's employment was made by Defendant Kosterman, who knew of, and investigated, the fraud committed by SCJ's Tax Department, and Defendant Eckhardt, who fraudulently signed and filed the second amended tax return on or about March 10, 2009 to again benefit from the IRS's errors.

cc.        On or about April 28, 2009, SCJ sued Plaintiff in Racine County Circuit Court,

claiming replevin of company property, breach of contract and conversion, all in relation to the documents Plaintiff copied and possessed pursuant to Defendant Camilli's request, which Plaintiff subsequently provided to the DOL in connection with DOL Case No. 2009-SOX-00033. Upon information and belief, the decision to sue Plaintiff was based upon information provided by the RICO Defendants.

        dd.    In approximately May and June 2009, SCJ caused to be published false and inflammatory statements about Plaintiff to various media outlets with the intention of humiliating Plaintiff and damaging his professional reputation. Upon information and belief, the information underlying SCJ's statements originated with the RICO Defendants.

        155.    All predicate acts committed by the RICO Defendants are related and were committed with a common scheme in mind: to conceal and benefit from erroneously-provided foreign tax credits, to defraud the IRS and United States taxpayers through that concealment, and to silence Plaintiff from exposing the errors and the RICO Defendants' unlawful actions.

        a.    It was part of the RICO Defendants' scheme to use the United States Postal Service to deliver fraudulent audit reports to the IRS to conceal the errors contained in the IRS audit reports for FYE 1998, 1999 and 2000, in violation of 18 U.S.C. § 1341.

        b.    It was part of the RICO Defendants' scheme to use the United States Postal Service to deliver fraudulent federal tax reports to the IRS to conceal the errors contained in the IRS audit reports for FYE 1998, 1999 and 2000, in violation of 18 U.S.C. § 1341.

        c.    It was part of the RICO Defendants' scheme to use the United States Postal Service to deliver fraudulently prepared and filed amended tax returns for SCJ to the IRS in approximately June 2005 and March 2009 to benefit from the errors contained in the IRS audit report for SCJ's

FYE 1998, in violation of 18 U.S.C. § 1341.

d.      It was part of the RICO Defendants' scheme to alter, destroy and falsify SCJ's business records to impede the IRS's discovery of the errors contained in its audit reports for FYE 1998, 1999 and 2000, and the RICO Defendants' illegal concealment thereof, in violation of 18 U.S.C. § 1519.

e.      It was part of the RICO Defendants' scheme to alter, destroy and falsify SCJ's business records to obstruct the availability of those records in any future proceedings brought by the IRS against SCJ, in violation of 18 U.S.C. § 1512(c)(1).

f.      It was part of the RICO Defendants' scheme to attempt to persuade Plaintiff in a corrupt manner from exposing the RICO Defendants' illegal racketeering activity by retroactively providing him a raise in salary and offering to partially compensate him for his attorney's fees, in violation of 18 U.S.C. § 1512(b)(3).

g.      It was part of the RICO Defendants' scheme to attempt to persuade Plaintiff in a corrupt manner not to expose the RICO Defendants' illegal racketeering activity by conditionally offering him the opportunity to resign with one year of salary and benefits if he agreed to a full release of claims against SCJ and confidentiality while the DOL was investigating the RICO Defendants' conduct, in violation of 18 U.S.C. § 1512(b)(3).

h.      It was part of the RICO Defendants' scheme to conspire to interfere with Plaintiff's lawful employment by conditionally offering him the opportunity to resign with one year of salary and benefits if he agreed to a full release of claims against SCJ and confidentiality while the DOL was investigating the RICO Defendants' conduct, in violation of 18 U.S.C. § 1513(f).

i.      It was part of the RICO Defendants' scheme to interfere with Plaintiff's lawful

employment and livelihood by terminating Plaintiff's employment in retaliation for providing truthful information relating to the RICO Defendants' fraudulent scheme to the DOL, in violation of 18 U.S.C. § 1513(e).

j.      It was part of the RICO Defendants' scheme to conspire to interfere with Plaintiff's lawful employment and livelihood by terminating Plaintiff's employment in retaliation for providing truthful information relating to the RICO Defendants' fraudulent scheme to the DOL, in violation of 18 U.S.C. § 1513(f).

k.      It was part of the RICO Defendants' scheme to interfere with Plaintiff's livelihood by filing a lawsuit against Plaintiff in retaliation for providing truthful information to the DOL relating to the RICO Defendants' scheme, in violation of 18 U.S.C. § 1513(e).

l.      It was part of the RICO Defendants' scheme to conspire to interfere with Plaintiff's livelihood by filing a lawsuit against Plaintiff in retaliation for providing truthful information to the DOL relating to the RICO Defendants' scheme, in violation of 18 U.S.C. § 1513(f).

m.      It was part of the RICO Defendants' scheme to interfere with Plaintiff's livelihood by disseminating defamatory statements about Plaintiff to the public through various media outlets in retaliation for providing truthful information to the DOL relating to the RICO Defendants' scheme, in violation of 18 U.S.C. § 1513(e).

n.      It was part of the RICO Defendants' scheme to conspire to interfere with Plaintiff's livelihood by disseminating defamatory statements about Plaintiff to the public through various media outlets in retaliation for providing truthful information to the DOL relating to the RICO Defendants' scheme, in violation of 18 U.S.C. § 1513(f).

156.      As a result of the RICO Defendants' pattern of racketeering activity, the RICO

Defendants have made unlawful and unwarranted financial gains and have directly interfered with Plaintiff's lawful employment and livelihood by affecting his ability to obtain lawful employment.

## **RICO VIOLATIONS**

### **18 U.S.C. § 1962(c)**

157.    Section 1962(c) of RICO provides that "it shall be unlawful for any person employed by…any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…."

158.    As set forth above, the RICO Defendants are employed by an enterprise, SCJ, which engages in interstate and foreign commerce.

159.    As set forth above, the RICO Defendants, as employees of the enterprise, used their positions with SCJ to conduct or participate, directly or indirectly, in the conduct of SCJ's affairs through a pattern of racketeering activity.

160.    As set forth herein, the RICO Defendants' pattern of racketeering activity is comprised of predicate acts including mail fraud, tampering and retaliation.

161.    As set forth above, the pattern of racketeering activity engaged-in by the RICO Defendants was for the common purpose of concealing and benefitting from erroneously-provided federal tax credits, to defraud the IRS and United States taxpayers through that concealment, and to silence Plaintiff from exposing that concealment.

### **18 U.S.C. § 1962(d)**

162.    Section 1962(d) of RICO makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

163.    The RICO Defendants' conspiracy to conceal and benefit from erroneously-provided federal tax credits, to defraud the IRS and United States taxpayers through that concealment, and to silence Plaintiff from exposing that concealment, as described above, violates 18 U.S.C. § 1962(d).

164.    Each RICO Defendant agreed to participate, directly or indirectly, in the conduct of the affairs of SCJ through a pattern of racketeering activity comprised of numerous acts of mail fraud, tampering and retaliation, and each RICO Defendant so participated in violation of 18 U.S.C. § 1962(c).

## COUNT ONE:  VIOLATION OF RICO 18 U.S.C. § 1962(c)

165.    Plaintiff realleges and incorporates by reference herein against the RICO Defendants paragraphs 1 – 164 above, as if fully set forth herein.

166.    As alleged with particularity above, the facts demonstrate that the RICO Defendants willingly and knowingly conducted or participated, directly or directly, in the conduct of SCJ's affairs through a pattern of racketeering activity.

167.    As alleged with particularity above, as a direct and proximate result of the RICO Defendants' aforementioned RICO conduct, Plaintiff's lawful employment and livelihood have been irreparably damaged.

168.    As alleged with particularity above, the RICO Defendants are jointly and severally liable to Plaintiff for treble damages, together with all costs for this action, plus reasonable attorneys fees as provided by 18 U.S.C. § 1964.

169.    To the extent permitted by law, Plaintiff is entitled to damages, plus court costs, and pre and post-judgment interest at the legally allowable limit.

45

## COUNT TWO: VIOLATION OF RICO 18 U.S.C. § 1962(d)

170. Plaintiff realleges and incorporates by reference herein against the RICO Defendants paragraphs 1 – 169 above, as if fully set forth herein.

171. As alleged with particularity above, the facts demonstrate that the RICO Defendants conspired to violate 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of SCJ through a pattern of racketeering activity.

172. As alleged with particularity above, as a direct and proximate result of the RICO Defendants' aforementioned RICO conduct, Plaintiff's lawful employment and livelihood have been irreparably damaged.

173. As alleged with particularity above, the RICO Defendants are jointly and severally liable to Plaintiff for treble damages, together with all costs for this action, plus reasonable attorneys fees as provided by 18 U.S.C. § 1964.

174. To the extent permitted by law, Plaintiff is entitled to damages, plus court costs, and pre and post-judgment interest at the legally allowable limit.

## PRAYER FOR RELIEF AS TO RICO COUNTS ONE AND TWO

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a.  Treble the amount of all wages and benefits Plaintiff would have received but for Defendants' unlawful conduct, including but not limited to back pay, front pay, and pre-judgment interest;

b.  Compensatory damages in an amount to be determined at trial to compensate Plaintiff for the damage to reputation, loss of career, humiliation, anguish and emotional distress caused by the RICO Defendants' unlawful conduct;

46

c. Treble and/or punitive damages as allowed by law;

d. An award of reasonable attorneys' fees, costs and litigation expenses pursuant to 18 U.S.C. § 1964(c) and all other applicable statutes; and

e. Such other relief as the Court may deem just or equitable.

### COUNT THREE:  BREACH OF CONTRACT

175. Plaintiff realleges and incorporates by reference paragraphs 1 – 143 above, as if fully set forth herein.

176. Defendant's "Standards of Conduct – Legal Compliance & Business Ethics" states an express contract between Defendant and its employees, including the Plaintiff.

177. Defendant breached the contract stated in Defendant's "Standards of Conduct – Legal Compliance & Business Ethics" by retaliating against Plaintiff in the terms and conditions of his employment by terminating him for reporting unlawful and unethical conduct in the Defendant's Tax Department and for filing a claim of such conduct with the DOL.

178. As a result of the Defendant's breach of contract, Plaintiff incurred damages including lost wages and benefits, attorney fees and other consequential damages in an amount to be proven at trial.

### COUNT FOUR:  WRONGFUL TERMINATION

179. Plaintiff realleges and incorporates by reference paragraphs 1 – 143 above, as if fully set forth herein.

180. Defendant wrongfully terminated the Plaintiff's employment in violation of the public policy of the State of Wisconsin of protecting corporate whistleblowers who report financial and accounting irregularities and fraud, as exemplified by the Sarbanes-Oxley Act, 15 U.S.C. §

47

7201, *et. seq.*, as amended.

181.    As a result of his wrongful termination, Plaintiff incurred damages including lost wages and benefits, attorney fees and other consequential damages in an amount to be proven at trial.

### COUNT FIVE:  DEFAMATION

182.    Plaintiff realleges and incorporates by reference paragraphs 1 – 143 above, as if fully set forth herein.

183.    Defendant unlawfully, intentionally and with malice defamed the Plaintiff after his termination by making false, misleading, humiliating and damaging statements about Plaintiff that were widely published to the public through online and print media.  When notified by Plaintiff that its conduct violated the law, Defendant refused to retract its defamatory statements.

184.    Defendant's defamatory statements about the Plaintiff were not privileged.

185.    As a result of Defendant's intentionally unlawful and malicious conduct, Plaintiff has suffered damages in the form of pain and suffering; emotional distress; humiliation, embarrassment and degradation; loss in wages and benefits; loss of career prospects and job opportunities; and continuing unemployment.

### PRAYER FOR RELIEF AS TO STATE LAW CLAIMS, COUNT THREE – FIVE

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

a.    A full make-whole remedy including but not limited to back pay and benefits, front pay, consequential and punitive damages, and pre-judgment and post-judgment interest;

b.    Compensatory damages in an amount to be determined at trial to compensate

48

Plaintiff for the damage to reputation, loss of career, humiliation, anguish and emotional distress caused by Defendant's unlawful conduct;

c.    An award of reasonable attorneys' fees, costs and litigation expenses; and

d.    Such other relief as the Court may deem just or equitable.

Dated this _____ day of February, 2010.

Respectfully submitted,
HEINS LAW OFFICE LLC


By: _s/ James A. Walcheske_____
Janet L. Heins, State Bar No. 10000677
James A. Walcheske, State Bar No. 1065635

HEINS LAW OFFICE LLC
1001 West Glen Oaks Lane, Suite 108
Mequon, Wisconsin 53092
(262) 241-8444 voice
(262) 241-8455 facsimile
e-mail: jheins@bizwi.rr.com
jwalcheske@bizwi.rr.com

49