# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

MICHAEL J. DEGUELLE,

        Plaintiff,

    v.                                    Case No. 10-CV-0103

KRISTIN J. CAMILLI, MARK H. ECKHARDT,
GAYLE P. KOSTERMAN, DONALD L. PAPPENFUSS,
ROBERT S. RANDLEMAN, DANIEL J. WENZEL, and
SC JOHNSON & SON INC.,

        Defendants.

_____

# ORDER

The plaintiff, Michael J. DeGuelle ("DeGuelle"), a former employee of SC Johnson & Son Inc. ("SCJ"), filed a complaint in this court on February 5, 2010, against his former employer and six former and current SCJ employees, alleging, among other claims, two causes of action arising under the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961. (Docket #1). Less than two weeks later, on February 17, 2010, the defendants collectively moved to dismiss the complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6). (Docket #7). The motion to dismiss has been fully briefed, and, accordingly, the court is prepared to rule on the motion. The court begins by recounting the facts as provided in the plaintiff's complaint.

## FACTUAL BACKGROUND

SCJ is a multinational company, selling consumer products in hundreds of countries with billions of dollars of revenue. (Compl. ¶¶ 14-16). DeGuelle's complaint to the court indicates that from January 2, 1997, until April 10, 2009, the plaintiff was employed at SCJ. (Compl. ¶ 12). From the commencement of his employment until September of 2004, DeGuelle served in SCJ's tax department as an "International Tax Compliance Manager" and, in the last four years of his employment, the plaintiff was SCJ's "State Tax Manager." *Id.* DeGuelle alleges in his complaint that during his tenure in both positions, he discovered several, and what he believes to be purposeful, errors in SCJ's tax reporting that resulted in gains for the company and personal benefits for some of SCJ's employees.

The first such error DeGuelle allegedly learned of was during his employment as SCJ's "International Tax Compliance Manager." In that position, the plaintiff was responsible for preparing various forms that the company would provide to the Internal Revenue Service. (Compl. ¶¶ 17-27). In these forms, SCJ was required to disclose income the company had derived from international commerce. *Id.* Moreover, the forms also provided SCJ an opportunity to disclose "tax credits" that would decrease the firm's tax liability. *Id.* The credits primarily stemmed from taxes the company paid to foreign governments. *Id.* DeGuelle alleges that on December 15, 2000, he discovered from audit reports provided to him by SCJ's global tax counsel, Daniel J. Wenzel ("Wenzel"), that SCJ had overstated the amount of foreign

-2-

tax credits it claimed in 1998, 1999, and 2000. (Compl. ¶ 31). Furthermore, the plaintiff broadly alleges that in January of the following year, soon after the plaintiff informed SCJ's tax counsel of the errors, that Wenzel told the plaintiff to ignore the problem and eventually forced DeGuelle to "alter, destroy and change SCJ's business records so that the IRS errors could not be detected." (Compl. ¶ 37). The plaintiff further contends that Wenzel's misdeeds did not cease in 2001, and that Wenzel instructed the plaintiff and a fellow employee to "structure a transaction that would allow SCJ to claim a tax deduction for the same goods sold twice" and to "destroy all business records of SCJ associated with the . . . transaction." (Compl. ¶ 38). DeGuelle argues that Wenzel took such actions in order to receive a "significantly higher discretionary bonus" from the company. (Compl. ¶ 42).

DeGuelle's complaint further alleges that four years later, in February of 2005, while DeGuelle was employed as a "State Tax Manager," Wenzel "instructed [the plaintiff] to fraudulently alter an income statement by improperly netting numbers on the statement against an expense, instead of reporting the numbers individually." (Compl. ¶ 47). The plaintiff states that he initially refused to comply with Wenzel's request, but upon receiving a memorandum to follow Wenzel's instructions from Donald L. Pappenfuss ("Pappenfuss"), a supervisor in SCJ's tax division, DeGuelle complied. (Compl. ¶¶ 50-52).

DeGuelle claims improprieties at SCJ continued into June of 2005 when Pappenfuss prepared an amended tax return for the 1998 fiscal year, reporting

-3-

"excess" tax credits on the amended return in order to, according to the plaintiff, obtain an undeserved tax refund. (Compl. ¶¶ 54-55). Subsequently, Robert Randleman ("Randleman"), SCJ's Vice President and Corporate Tax Counsel, signed the amended return and submitted it to the IRS. (Compl. ¶ 56). The plaintiff alleges another error occurred in July of 2007, when Pappenfuss and Wenzel ignored DeGuelle's contention that SCJ needed to "make a reserve" for state tax purposes because a "potential $30,000,000 exposure" to SCJ stemming from an intercompany loan. (Compl. ¶ ¶ 58-59).

In October of 2007, DeGuelle complained to the Director of Human Resources at SCJ, Kristin J. Camilli ("Camilli"), and contended that Wenzel was "creating a hostile work environment for him." (Compl. ¶ 60). However, in January of 2008, Camilli met with DeGuelle and told him that, based on her investigation, she found that Wenzel "was not creating a hostile working environment." (Comp. ¶ 62). Finding Camilli's treatment of his complaint unsatisfying, the plaintiff opted to disclose Wenzel's misconduct to SCJ's human resources director. *Id.* Concerned with the plaintiff's allegations, Camilli asked DeGuelle to cooperate in an internal investigation regarding Wenzel's alleged improprieties by providing her copies of SCJ's tax records. (Compl. ¶ 63). To properly investigate the plaintiff's allegations, SCJ created an internal committee, comprised of Gayle P. Kosterman ("Kosterman"), SCJ's executive Vice President of Worldwide Human Resources, SCJ's general counsel, and SCJ's head of internal audit. (Compl. ¶ 65). The

-4-

internal committee also hired the international law firm of Kirkland & Ellis LLP ("Kirkland") to investigate the matter. (Compl. ¶ 67). The plaintiff subsequently spoke with attorneys from Kirkland to discuss the matter. (Compl. ¶ 68). Nothing in the complaint indicates that the internal committee investigating the matter, Kirkland, or any other auditor found anything improper with what was occurring in SCJ's tax department.

In March of 2008, the plaintiff alleges that Wenzel met with DeGuelle and began to "yell" at the plaintiff for having "discussions with others in Accounting and Human Resources." (Compl. ¶ 70). That same month, the plaintiff received a poor performance review (Compl. ¶ 73), despite receiving an award for his job performance two months earlier. (Compl. ¶ 69). One month later, the plaintiff requested a "salary adjustment," such that he would receive a raise substantially above the $103,000 annual salary he was currently earning. (Compl. ¶ 76). DeGuelle contends that Wenzel denied the plaintiff's request because of "some of the problems" the plaintiff "had in the past few months." (Compl. ¶ 77).

In a May 2008 meeting, Ms. Kosterman informed the plaintiff that "neither . . . Wenzel nor any other employee of SCJ committed any wrongdoing." (Compl. ¶ 78). However, in the months that followed, the plaintiff continued to express frustrations with Wenzel's decisions regarding SCJ's compliance with the law. (Compl. ¶¶ 80-83). On September 23, 2008, the plaintiff received another poor performance evaluation from Wenzel. (Compl. ¶¶ 84-85). After DeGuelle complained about the

-5-

evaluation, Kosterman and Camilli investigated the matter and ultimately "revoked and invalidated" the evaluation in December of 2008. (Compl. ¶ 91).

At a meeting between Kosterman, Camilli, and DeGuelle on December 18, 2008, the plaintiff rejected requests to cease complaining about the irregularities with SCJ's tax reporting, informed the SCJ's officials that he would be reporting the alleged improprieties to the United States Department of Labor, and renewed his request for a salary increase. (Compl. ¶¶ 91-92). Later in the day, according to the complaint, Ms. Kosterman and Ms. Camilli contacted DeGuelle and told him that SCJ would provide him with a retroactive merit increase in salary and would pay DeGuelle's attorney fees if the plaintiff signed a "full release of claims and [a] confidentiality agreement." (Compl. ¶ 93). The plaintiff rejected the offer. (Compl. ¶ 94). Nonetheless, Camilli later informed DeGuelle that he would still be receiving an increase in salary and that his poor performance review would "disappear." *Id.*

On the same day the plaintiff met with Kosterman and Camilli, December 18, 2008, DeGuelle filed a whistleblower complaint with the Department of Labor regarding the "tax fraud" being committed in SCJ's tax department, providing the government with internal documents from SCJ. (Compl. ¶ 95). A month later, the plaintiff made a similar complaint to the Internal Revenue Service and the Department of Justice. (Compl. ¶ 98). Eventually, the various government agencies informed DeGuelle that the government would not act on his complaints because SCJ was not a covered entity under the relevant laws and regulations. (Compl.

-6-

¶¶ 98, 104). Nothing in the complaint suggests that the government took any substantive actions to prosecute individuals at SCJ.

In early February of 2009, the plaintiff emailed Dr. H. Fisk Johnson, ("Johnson"), the Chief Executive Officer of the company, requesting a personal meeting to discuss what DeGuelle perceived to be illegal acts occurring in the company. (Compl. ¶ 101). On February 10, 2009, after Johnson had forwarded the email to SCJ's human resources department, Kosterman met with DeGuelle, informing the plaintiff that the company had investigated his allegations and found no illegal actions had taken place, ultimately telling DeGuelle "it is appropriate for you and the company to move beyond these issues." (Compl. ¶¶ 102-03).

DeGuelle claims that SCJ tax department's improprieties did not end, however. On March 10, 2009, the plaintiff alleges the tax department filed a second amended return for fiscal year 1998, which claimed "excess foreign tax credits . . . to fraudulently obtain a tax refund." (Compl. ¶¶ 107-08). DeGuelle states, without explaining, "on information and belief, the RICO Defendants personally benefitted from the amended tax returns . . . as they received significantly higher discretionary bonuses from SCJ in those years." (Compl. ¶ 109). Troubled by what he saw, on March 19, 2009, DeGuelle provided SCJ's tax counsel with a five page memorandum detailing his concerns regarding the misconduct of SCJ's tax department. (Compl. ¶ 110).

-7-

The complaint further alleges that in March of 2009 Kosterman offered DeGuelle "the opportunity to resign his employment with SCJ in exchange for one year salary and benefits if he agreed to release any and all legal claims and agreed to confidentiality," which the plaintiff subsequently rejected. (Compl. ¶ 112). In April of 2009, Camilli and Beth P. Klimczack ("Klimczack"), SCJ's tax counsel, informed the plaintiff that the company was investigating him in connection with his taking of confidential business documents and disclosing those documents outside the company. (Compl. ¶ 113). On April 9, 2009, after the plaintiff had an opportunity to visit his desk and turn in any documents he was working with to the company, DeGuelle was "escorted" from the building by security personnel. (Compl. ¶ 114). The following day, Camilli, with Klimczack present, informed DeGuelle that "his employment was terminated for taking confidential business documents," including the documents the plaintiff had provided to the Department of Labor, and "disclosing them outside the company and for not being truthful during the investigation." (Compl. ¶ 116). The plaintiff claims that Mark H. Eckhardt ("Eckhardt"), the Vice President and Chief Information Officer for SCJ, and Kosterman made the final decision to terminate DeGuelle. (Compl. ¶ 117).

On April 28, 2009, SCJ brought a civil suit against DeGuelle in Wisconsin state court in Racine County claiming "replevin of company property, documentation and confidential information, breach of contract, and conversion." (Compl. ¶ 123). In the months that followed, SCJ has made a series of allegedly "defamatory"

statements that were published in local media outlets, such as the Racine Journal Times. (Compl. ¶¶ 126-143).

Ultimately, on February 5, 2010, the plaintiff filed a lawsuit in this court against SCJ, Camilli, Eckhardt, Kosterman, Pappenfuss, Randleman, and Wenzel, alleging RICO violations against the individually named defendants. (Docket #1). Specifically, the plaintiff contends the individual defendants have acted in violation of 18 U.S.C. § 1962(c) and (d), respectively. (Compl. ¶¶ 145-46). The complaint also alleges state law breach of contract, wrongful termination, and defamation claims. (Compl. ¶¶ 175- 85). Against this backdrop, the court now proceeds to address the motion to dismiss.

## DISCUSSION

Fed. R. Civ. P. 12(b)(6) permits a defendant to make a motion to dismiss a complaint for failure to state a claim upon which relief can be granted. To survive a 12(b)(6) motion to dismiss, the plaintiff's complaint must only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-57, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)) (emphasis added). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

Case 2:10-cv-00103-JPS   Filed 04/09/10   Page 9 of 25   Document 11

liable for the misconduct alleged."[1] *Iqbal,* 129 S. Ct. at 1949. In addressing whether a complaint alleges "sufficient" facts, the court must take into consideration the complexity of the case. *Limestone Dev. Corp. v. Village of Lemont, Ill.,* 520 F.3d 797, 803 (7th Cir. 2008). In RICO cases, "where discovery is likely to be more than usually costly, the complaint must include as much factual detail and argument as may be required to show that the plaintiff has a plausible claim." *Id.* at 803-04. Moreover, "allegations of fraud in a civil RICO claim are subject to the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b), which requires a plaintiff to plead all allegations of fraud with particularity." *Kaye v. D'Amato*, No. 09-1091, 2009 U.S. App. LEXIS 26526, at *9 (7th Cir. Dec. 4, 2009). At a minimum, the complaint must describe the predicate acts with some specificity and the time, place, and content of the alleged communications perpetrating the fraud. *Id.* With these standards in mind, the court proceeds to examine the legal sufficiency of each of the claims alleged in DeGuelle's complaint.

DeGuelle's RICO claims allege violations of 18 U.S.C. § 1962(c) and (d), respectively, by the individually named defendants. The cause of action that permits

---

[1] The court is also guided by the Seventh Circuit recent synthesis of the Supreme Court's case law on Fed. R. Civ. P. 12(b)(6):

"So, what do we take away from *Twombly, Erickson,* and *Iqbal*? First, a plaintiff must provide notice to defendants of her claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements."

*Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

a civil suit for a violation of § 1962(c) and (d) is formally addressed in 18 U.S.C. § 1964(c). That statute provides, in relevant part, that "any person injured in his business or property by reason of a violation of section 1962 . . . may sue therefor in any appropriate United States district court." 18 U.S.C. § 1964(c). Accordingly, a civil RICO cause of action requires DeGuelle to adequately plead three things: (1) an injury in his business or property (2) "by reason of" (3) the defendants' violation of section 1962. *RWB Servs., LLC v. Hartford Computer Group*, 539 F.3d 681, 685 (7th Cir. 2008). The defendants do not contest that the plaintiff suffered an injury to his business or property, in that DeGuelle was terminated from his job, sued by the defendants, and allegedly defamed by the defendants.[2] Because the causation prong of making out a § 1964(c) claim is contingent on a violation of § 1962, the court must first examine whether the plaintiff's pleadings are legally sufficient to meet the third prong of a civil RICO claim.

DeGuelle first states in his complaint that the individual defendants violated § 1962(c). The court is obliged to keep in mind throughout its analysis that RICO "does not cover all instances of wrong-doing," but is rather a "unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006). In "keeping with this limited purpose," there are four elements, each of which must be proven, to establish a

---

[2] However, § 1964(c) only permits recovery to injuries to one's business or property and not for personal injuries, such as humiliation, anguish, and emotional distress. *Evans v. City of Chicago*, 434 F.3d 916, 930 (7th Cir. 2006) ("personal injuries, and the pecuniary losses flowing from those injuries, are insufficient to establish standing under the civil RICO, § 1964(c)").

Case 2:10-cv-00103-JPS   Filed 04/09/10   Page 11 of 25   Document 11

violation of § 1962(c): (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Id.* (citing *Sedima v. Imrex Co.,* 473 U.S. 479, 496 (1985). "Racketeering activity" in this case means "any act which is indictable under . . . section 1341 (relating to mail fraud) . . . section 1512 (relating to tampering with a witness, victim or an informant) . . . [or] section 1513 (relating to retaliating against a witness, victim, or an informant.")[3] 18 U.S.C. § 1961(1). The plaintiff contends in his complaint that the defendants had a scheme "to conceal and benefit from erroneously-provided foreign tax credits, to defraud the IRS and United States taxpayers through that concealment, and to silence" DeGuelle to prevent him "from exposing the errors and the RICO defendants' unlawful actions." (Compl. ¶ 155). The plaintiff outlines in his complaint the specific "predicate acts" that the defendants did to fulfill the defendants' "scheme" including: (1) using the United States Postal Service to deliver fraudulent audit reports, tax reports, and tax returns to the IRS in violation of 18 U.S.C. § 1341, (Compl. ¶ 155(a)-(c)); (2) altering, destroying and falsifying SCJ's records to "obstruct the availability of those records" in future proceedings in violation of 18 U.S.C. § 1512(c)(1), (Compl. ¶ 155(e)); (3) attempting to persuade the plaintiff in a "corrupt manner" from exposing the defendants'

---

[3] In the plaintiff's complaint, DeGuelle alleges that the defendants engaged in actions that violated 18 U.S.C. §§ 1341, 1512, 1513, and 1519. (Compl. ¶ 152). However, 18 U.S.C. § 1519 is not listed in the RICO statute as a criminal statute whose violation can constitute "racketeering activity." 18 U.S.C. § 1961(1). As such, the court will disregard any predicate acts done in violation of 18 U.S.C. § 1519. Section 1961(1) sets forth an exclusive list of predicate offenses and, therefore, no unenumerated offense (no matter how similar to those enumerated in § 1961(1)) can constitute a predicate act. *See Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 48 (1st Cir. 1991).

Case 2:10-cv-00103-JPS   Filed 04/09/10   Page 12 of 25   Document 11

activities by offering him benefits, such as a raise or a year of salary and benefits upon resignation, in violation of 18 U.S.C. § 1512(b)(3), (Compl. ¶ 155(f)-(g)); and (4) interfering with the plaintiff's lawful employment and/or livelihood by: (a) offering him a full year of salary and benefits to resign and waive claims against the company after the plaintiff submitted complaints to the government about SCJ; (b) terminating the plaintiff's employment in retaliation for reporting SCJ's activities to the government; (c) filing a lawsuit against the plaintiff in retaliation for DeGuelle's whistle blowing; and (d) disseminating defamatory statements about the plaintiff in retaliation for his actions, all done in violation of 18 U.S.C. § 1513(e) and (f) (Compl. ¶ 155 (h)-(n)).

The defendants argue that the plaintiff's complaint is insufficient with respect to only one of the four elements of a § 1962(c) violation: alleging a "pattern of racketeering activity." Under the statute, a "pattern of racketeering activity" requires at least two predicate acts within a ten-year period. 18 U.S.C. § 1961(5). The plaintiff's complaint plainly meets the statutory definition of "pattern of racketeering activity," as the plaintiff has alleged several predicate acts occurring within a ten-year period. However, establishing a "pattern" also requires that the plaintiff demonstrate that the racketeering predicates: (1) are related; and (2) "amount to or pose a threat of continued criminal activity." *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 249 (1989).

-13-

The first issue the court must resolve is determining whether the predicate acts complained of are related. The predicate acts of racketeering satisfy the relationship test if they have "same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240.

Here, the court agrees with the defendants that, assuming the plaintiff's allegations to be true, only some of the predicate acts complained of are related. Ultimately, the court views the predicate acts outlined in the complaint as constituting two separate schemes – a scheme to defraud the United States of tax revenue, and a scheme to retaliate against the defendant for reporting SCJ's misdeeds. Specifically, three of SJC's predicate acts – (1) using the United States Postal Service to defraud the government through the filing of faulty tax returns; (2) destroying records to cover up the improprieties; and (3) offering the plaintiff benefits to persuade him not to disclose the company's illicit actions – collectively had a purpose of successfully swindling the government out of money.[4] The remaining predicate acts – interfering with the plaintiff's employment and livelihood by: (1) cajoling the plaintiff into resigning from his job; (2) terminating the plaintiff's employment; (3) filing a lawsuit against the plaintiff; and (4) making defamatory statements against the plaintiff – are divorced from the scheme to defraud. The

---

[4] Assuming the plaintiff's allegations to be true, the destruction of records and the corrupt persuasion of the plaintiff were efforts to cover up the defendant's scheme to defraud the government.

-14-

latter four actions all occurred *after* DeGuelle disclosed to the government SCJ's allegedly fraudulent actions and were done with the exclusive purpose of retaliating against DeGuelle for being a whistleblower.[5]  Moreover, the victims of the scheme to defraud were the "IRS and United States taxpayers," (Compl. ¶ 155), whereas the scheme to retaliate had a distinct victim, the plaintiff.  Additionally, the different predicate acts were perpetrated by separate individuals: the attempts to defraud the government were taken by defendants Wenzel, Pappenfuss, and Randleman, members of SCJ's tax department; where as, the attempts to retaliate against the plaintiff for reporting SCJ's conduct to the government were done by Camilli and Kosterman, members of SCJ's human resources group, and Eckhardt, an executive at SCJ.[6]  In sum, the court finds that collectively the predicate acts are unrelated, and in fact constitute two distinct schemes.  *See Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 779 (7th Cir. 1994)  ("The relationship part of this 'continuity

---

[5] Given that the plaintiff had already disclosed the defendants' conduct to the government, any actions by the defendants after the fact could not have been a cover up of the fraud as the "jig was up."

[6] Indeed, DeGuelle's complaint is bereft of any allegation that SCJ's human resources department was somehow in "cahoots" with SCJ's tax department in the latter's attempt to commit tax fraud.  If anything, Camilli, Kosterman, and Eckhardt created roadblocks that made it harder for SCJ's tax department to commit fraud.  DeGuelle's complaint indicates that instead of cooperating with or aiding Wenzel, Pappenfuss, and Randleman's misconduct, the remaining defendants took the plaintiff's complaint quite seriously.  Camilli and Kosterman independently investigated DeGuelle's allegations and even went so far as to hire an external auditor to monitor SCJ's compliance with federal tax regulations.  In addition, Camilli and Kosterman revoked Wenzel's poor review of DeGuelle's performance.  The complaint hints that Camilli and Kosterman aided the tax fraud scheme by making an offer on behalf of the company to pay the plaintiff's attorney fees in exchange for his confidentiality, but there is nothing in the complaint to indicate that this was done to further tax fraud.  In sum, there is little, if anything, in the complaint to connect Camilli, Kosterman, and Eckhardt to the tax fraud scheme, and the court views the plaintiff's complaint as an attempt to "lump" the latter three defendants with the others as a thinly veiled means to acquire standing for the more obvious RICO violations.  *See Goren v. New Vision Int'l*, 156 F.3d 721, 730 (7th Cir. 1998) ([S]uch "lumping together" of defendants is clearly insufficient to state a RICO claim under § 1962(c)).

plus relationship' test requires that the predicate acts be 'committed somewhat closely in time to one another, involve the same victim, or involve the same type of misconduct.'") (internal citations omitted).

DeGuelle makes two arguments as to why the two sets of predicate acts are related. First, the plaintiff points to the statement in his complaint that "all predicate acts committed by the RICO defendants are related," arguing that the scheme collectively was for the defendants to defraud the United States by concealing and benefitting from "erroneously-provided foreign tax credits" and to silence the plaintiff from exposing the errors. (Pl's Resp. Br. 14). However, the plaintiff's conclusory legal statement made in his complaint does not suffice to survive a motion to dismiss. *Brooks,* 578 F.3d at 581 ("[I]n considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements."). The plaintiff cannot artificially join two separate schemes together by merely declaring that the predicate acts are collectively related. More importantly, however, the plaintiff fails to explain how the various predicate acts that collectively attempted to "interfere with the lawful employment or livelihood" of DeGuelle were an attempt to "silence" the plaintiff. Indeed, even assuming all of DeGuelle's allegations to be true, SCJ could not have tried to silence the plaintiff by, for example, terminating him, as the plaintiff had already broken any silence by disclosing to the government SCJ's alleged improprieties. In fact, the predicate acts that DeGuelle alleges occurred arise under

-16-

18 U.S.C. § 1513 (e), which punishes conduct that interferes with the lawful employment or livelihood of any person with the "intent to retaliate . . . for providing to a law enforcement officer any truthful information relating to the commission or possible commission of a Federal offense."[7] The conduct DeGuelle complains of constitutes completely separate criminal activity, the attempt to retaliate against someone for disclosing information about a potential federal offense.[8]

DeGuelle also argues, citing to the cases of *Midwest Grinding v. Spitz,* 976 F.2d 1016 (7th Cir. 1992) and *Jones v. Lampe*, 845 F.2d 755 (7th Cir. 1988), that "cover-up activity" can be "part and parcel of an underlying scheme to defraud." (Pl's Resp. Br. 14). The court does not disagree with the plaintiff on the principle of law he articulates, as attempts to try to silence someone from disclosing fraudulent activity are actions taken in furtherance of ensuring the fraudulent activity occurs. However, the plaintiff misses the point. The plaintiff has only described one predicate act in his complaint that describes an attempt to "silence" DeGuelle from disclosing SCJ's alleged illegalities, the offer of benefits to the plaintiff in return for his maintaining confidentiality. Even if the court assumes the plaintiff's allegations to be true, the predicate acts taken in violation of 18 U.S.C. § 1513(e) and (f) were

---

[7] DeGuelle also alleges predicate acts arising under 18 U.S.C. § 1513(f), but that section of the statute merely makes it a crime to conspire to commit an offense under § 1513. Given that § 1513(e) is the only offense articulated by the plaintiff in his complaint or in his briefs to the court, the court assumes the plaintiff is alleging that the defendants conspired to retaliate against DeGuelle for reporting information regarding the possible commission of a federal offense to the government.

[8] In fact, the court is at a loss as to how terminating DeGuelle could have been an attempt by the defendants to silence him. Wrongfully terminating an employee would seem to only make the plaintiff *more* likely to report the misdeeds of the company externally.

-17-

not an attempt to further fraudulent tax reporting, but were rather, at best, a separate scheme engineered by different parties to retaliate against DeGuelle for reporting SCJ's alleged fraudulent activities to the government. Nothing in *Midwest Grinding* or *Lampe* suggests that a scheme to defraud the government by one group within an organization can be related to a separate attempt to retaliate against a whistleblower perpetrated by a different group of people. *See Lampe*, 845 F.2d at 758 ("[M]erely stating [that defendants engaged in actions that constituted a collective schemes], however, does not make the allegations sufficient...plaintiffs' characterization of events must be consistent with the facts alleged in the complaint.")

As such, the court views the complaint as alleging two completely separate schemes – a scheme to defraud and a scheme to retaliate. However, the defendants concede that the predicate acts within each scheme are related, requiring the court to evaluate each set of predicate acts to determine whether collectively either of the sets "amount to or pose a threat of continued criminal activity," *H.J., Inc.,* 492 U.S. at 249, such that the defendants engaged in a pattern of racketeering activity.

Overall, the continuity requirement reflects Congress' desire to use RICO to target the unique dangers posed by long-term criminal conduct as opposed to discrete acts of fraud. *Id.* at 242. To ensure that civil RICO claims were restricted to combat such criminal conduct, the Supreme Court stated that a plaintiff can satisfy

-18-

the continuity requirement by showing "closed-ended" continuity or "open-ended" continuity. *Id.* at 241-42. Continuity is closed-ended if the related predicate acts have ceased but extended over such a substantial period of time that they pose an implicit risk of future harm. *Roger Whitmore's Auto. Services, Inc. v. Lake County*, 424 F.3d 659, 672-73 (7th Cir. 2005). The Seventh Circuit has analyzed closed-ended continuity by considering "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986). No one factor is decisive. *Id.* at 976.

Here, the tax fraud scheme satisfies the closed-ended continuity test. The allegations made in the complaint indicate that, over a period of five years, starting in 2004 and ending in 2009, several of the defendants repeatedly engaged in actions that allegedly constituted fraud to reduce SCJ's tax liability. The tax fraud occurred in a variety of ways, such as inflating the tax credits and deductions that SCJ claimed on its federal tax returns.

However, the court is unable to conclude that the retaliation scheme meets the closed-ended continuity test. Assuming everything in the plaintiff's complaint to be true, three of the defendants attempted to retaliate against the plaintiff for his reporting of SCJ's conduct to the government over a short period of time, five to six months at the most. The scheme to retaliate against the plaintiff ultimately only involved a few predicate acts, including terminating the plaintiff's employment, suing

the plaintiff, and making statements about the plaintiff to local news outlets. Moreover, the only victim alleged from the retaliation scheme is the plaintiff. In short, such conduct does not fit within the definition of closed-ended continuity. *See Midwest Grinding Co.,* 976 F.2d at 1024 (finding that predicate acts that are a "one-shot" scheme stretching over "at most . . . nine months" does not meet the definition of closed-ended continuity).

The court must then determine whether open-ended continuity exists in this case with respect to the retaliation scheme. Continuity is open-ended if the alleged scheme is of limited duration but threatens repetition and future harm. *Gamboa,* 457 F.3d at 706. A plaintiff can demonstrate open-ended continuity by showing one of three things: "(1) 'a specific threat of repetition' exists; (2) 'the predicates are a regular way of conducting an ongoing legitimate business,' or (3) 'the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes.'" *Vicom*, 20 F.3d at 782 (quoting *H.J. Inc.*, 492 U.S. at 242-43). Here, there is nothing to indicate that the defendants' retaliatory actions against the plaintiff will repeat into the future, such as a specific threat of repetition or the nature of the enterprise. The plaintiff only argues that because a majority of the defendants still work at SCJ that they have the propensity to retaliate against the plaintiff in the future. However, such "cursory and unparticularized allegations" will not suffice to meet the standard of open-ended continuity. *Vicom,* 20 F.3d at 783; *see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260,

-20-

1264 (D.C. Cir. 1995) ("The only possible rationale that could support such a prediction – once a RICO violator, always a RICO violator – would deprive the pattern requirement of all meaning by establishing open-ended continuity whenever two or more predicate acts were shown.") Ultimately, with respect to the retaliation scheme, such "isolated instances of criminal behavior, not presenting at least some threat of future harm, cannot meet § 1962(c)'s continuity element." *Gamboa*, 457 F.3d at 706.

Given this, the court finds that the plaintiff has not sufficiently plead that a violation of § 1962(c) occurred through the predicate acts constituting the retaliation scheme. However, the court does find that the plaintiff has adequately plead that a violation of § 1962(c) occurred through the predicate acts that form the tax fraud scheme.[9] As a result, with respect to the tax fraud scheme, the plaintiff's complaint adequate pleads the third prong of making out a § 1964(c) claim. All that is left for the court to determine is whether, assuming the plaintiff's allegations to be true, the injuries to the plaintiff's business or property were "by reason of" the defendants' violations of § 1962.

---

[9] The court need not opine on whether the plaintiff has adequately plead a violation of § 1962(d), which makes it unlawful "for any person to conspire to violate any of the provisions of" § 1962 (a), (b), or (c). Even if the court finds that there was an agreement between the defendants to conspire to commit tax fraud, the question would still remain as to whether the plaintiff has proven that his injuries were "by reason of" the agreement to violate § 1962(c). Given the court's answer to the causation question, the court will not discuss whether a violation of § 1962(d) has occurred. *See Daniels v. Liberty Mut. Ins. Co.*, 484 F.3d 884, 888 (7th Cir. 2007) (holding that a federal court should not discuss legal issues that would not change the court's ultimate conclusion, as such a discussion would be advisory in nature).

The Supreme Court has interpreted the "by reason of" language in § 1964(c) as requiring that the defendant's violations be a proximate cause of the plaintiff's injury – i.e., that there was a direct relationship between the plaintiff's injury and the defendant's injurious conduct. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). A plaintiff who is harmed merely as the result of the "misfortunes visited upon a third person" by a defendant's conduct generally cannot establish this direct relation. *Id.* at 268-69; *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006) ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries).

DeGuelle alleges that his "injuries to his business or property" are the termination of his employment, the lawsuit brought by SCJ against him, and the defamatory statements made by SCJ to the press in the wake of that lawsuit. (Pl's Resp. Br. 16) ("The multiple victims suffered separate and distinct injuries . . . Plaintiff was terminated, sued, defamed."). However, none of these injuries are directly attributable to the tax fraud scheme. The only party that would have been directly injured by the alleged tax scheme was the United States federal government. At best, the fraud scheme was a "but for" cause of DeGuelle's injuries, but such causation is inadequate to satisfy the final prong of a § 1964(c) claim. *Holmes,* 503

-22-

U.S. at 268.   As such, the court will dismiss the plaintiff's RICO claims with prejudice.[10]

The remaining counts in DeGuelle's complaint against the defendants are not based on federal law, but rather stem from state statutory or state common law.  The only basis for the court to exercise jurisdiction over these remaining state law claims is the court's supplemental jurisdiction as provided by 28 U.S.C. § 1367(a).[11]  As a general rule, when all federal claims have been dismissed prior to trial and only pendant claims remain, "the federal court should relinquish jurisdiction over the remaining pendant state claims."  *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007); *see also Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n

---

[10] Generally, courts grant leave to amend a complaint after granting a motion to dismiss the original complaint under Fed. R. Civ. P. 12(b).  *See* Fed. R. Civ. P. 15(a) (providing that leave to amend a complaint should be freely given when justice so requires).  However, a district court may deny leave to amend for "undue delay, bad faith, dilatory motive, prejudice, or futility."  *Winters v. Fru-Con Inc.*, 498 F.3d 734, 740 (7th Cir. 2007).  Futile repleadings include "restating the same facts using different language, reasserting claims previous determined, failing to state a valid theory of liability, and the inability to survive a motion to dismiss."  *Garcia v. City of Chicago*, 24 F.3d 966 (7th Cir. 1994).  Here, DeGuelle did not seek leave to amend his complaint, and for that reason alone, the court would be justified in dismissing his claims with prejudice.  *See James Cape & Sons Co. v. PCC Const. Co.,* 453 F.3d 396, 400-01 (7th Cir. 2006) (holding that a district court did not abuse discretion in dismissing claims with prejudice where the plaintiff did not request leave to amend and pleadings were deficient).  Moreover, it was not for a lack of clarity that the court finds DeGuelle's pleadings to be insufficient.  Rather, the court dismisses the complaint because the plaintiff's lawsuit constitutes a rather thinly veiled attempt to transform allegations of wrongful termination into a RICO action.  The court cannot imagine what more the plaintiff could have plead to repair the current infirmities with the complaint.  *Id.* at 401 ("District judges are not mind readers, and should not be required to explain to parties whether or how their complaints could be drafted to survive a motion to dismiss.")  Allowing DeGuelle to amend his complaint would only allow him to continue on a hopeless journey to try to fit the proverbial "round peg" into a "square hole."  Fed. R. Civ. P. 15(a) only allows a complaint to be amended when justice so requires, and the court finds that it would be unjust to require that the defendants defend against the plaintiff's hopeless RICO claims.  As such, the court is obliged to dismiss the RICO claims with prejudice.

[11] Diversity jurisdiction does not exist in this case.  Federal diversity jurisdiction, as granted by 28 U.S.C. § 1332(c) , requires "complete diversity" between all plaintiffs and all defendants – that is, each plaintiff must be a citizen of a different state than each of the defendants.  *Lincoln Property Co. v. Roche,* 546 U.S. 81, 89 (2005).  Here, complete diversity is lacking with all of the state law claims:  both DeGuelle and all of the defendants are citizens of Wisconsin.  (Comp. ¶¶ 4-11).

the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine – judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state-law claims") (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)).  However, there are three exceptions to this general rule:  (1) when the refilling of the state claims is barred by the statute of limitations; (2) where substantial judicial resources have already been expended on the state claims; and (3) when it is clearly apparent how the state claim is to be decided.  *Williams*, 509 F.3d at 404 .  Having said that, DeGuelle does not argue and the court cannot conclude that any of the three exceptions apply in this case.  Given the early stage of this litigation, the court finds that dismissing the pendent claims such that the plaintiff can seek remedy in a state court proceeding is the most prudent course of action.

Accordingly,

**IT IS ORDERED** that defendant's motion to dismiss the complaint (Docket #7) be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that **Counts One and Two** of the complaint be and the same are hereby **DISMISSED with prejudice** and **Counts Three, Four, and Five** be and the same are hereby **DISMISSED without prejudice.**

-24-

The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 9th day of April, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge